# Court of Appeals.

May 4, 1897.

## PEOPLE v. GUISEPPE CONSTANTINO.

1. HOMICIDE—SELF DEFENSE.

When one believes himself about to be attacked by another, and to receive great bodily injury, it is his duty to avoid the attack, if in his power so to do, and the right of attack for the purpose of self defense does not arise until he has done everything in his power to avoid its necessity.

2. CRIMINAL LAW—INTERPRETERS.

Where the district attorney objects to the swearing of a second interpreter and states that one of the counsel for the defendant is acquainted with and understands the Italian language, but the counsel referred to states that his knowledge of the language is limited, and that he is not able to converse with the witnesses in the various dialects which they use, the court does not err in refusing such appointment where the record does not show any lack of ability or integrity upon the interpreter's part.

3. SAME—SECTION 528 OF CRIMINAL CODE.

Section 528 must be construed in connection with § 542 of the Criminal Code.

4. SAME—INSTRUCTION.

Where the proof establishes that the decedent stood in front of the defendant while he had his pistol in his hand, threatening to kill the decedent, from a half a minute to two minutes, the fact that the court took out his watch and illustrated to the jury a minute of time, while presenting the question whether there was sufficient time for such a degree of deliberation and premeditation as would constitute the crime of murder in the first degree, is not error.

5. SAME—MISCONDUCT OF JURY.

It is not sufficient ground for a reversal that the jury, while in charge of two officers, attended church though the topic of the sermon was the prevalence of crime, where the officers, as soon as they discovered that anything might be said which would prejudice the jury, at once left the church with them, and the court out of extreme caution instructed them that no opinion expressed by the pastor should have the slightest weight or influence upon their minds, but that their verdict must be based solely upon the evidence produced before them,

6. INDICTMENT—COMMON LAW COUNTS.

An indictment in common law form, stating the facts constituting the crime and charging the killing to have been done willfully, feloniously and with malice aforethought, is sufficient to sustain a conviction of murder in the first degree, if the proof as to the manner of the commission of the crime brought it within one of the statutory definitions.

Appeal from a judgment and an order denying a motion for a new trial.

Charles A. Miller and James W. Rayhill, for appellant.

George S. Klock, Dist. Atty., for the People.

MARTIN, J.—The defendant was indicted for the crime of murder in the first degree. The indictment contained two counts. In the first it was charged that the defendant on the 10th day of January, 1896, at the city of Utica, N. Y., shot and killed one Pietro Domenicho Galiotti, with a deliberate and premeditated design to effect his death. In the second the same offense was charged as having been committed by the defendant willfully, wrongfully, unlawfully, feloniously, and with malice aforethought. The defendant and decedent were both Italians. As the former was examined on the trial through the aid of an interpreter, presumably he neither understood nor spoke the English language, although he had been in this country six or seven years. He had resided in Utica a little more than a month at the time of the homicide. During that time he had boarded at No. 1 Montgomery street, with a number of other Italians, among whom were Carlo Veschi and Pasquale Gaetano. Veschi occupied the same room with the defendant, and a portion of the time the same bed. The decedent was a married man residing in the same city, was a carpenter, and had been in this country only about eight months. Before coming here, he had served nearly $3\frac{1}{2}$ years in the Italian army. He resided with Pietro Saro, whose daughter he married. At about 10 o'clock on the morning of January 10, 1896, the defendant visited a saloon kept by De Luna & Seca at 545 Bleecker street in the city of Utica, where he met Veschi and others of his countrymen, among whom were the decedent and his father-in-law, who reached the saloon at about half-past 1 o'-clock. They immediately went to the front room on the second floor of the building occupied as a saloon. After the arrival of the decedent, a portion of the people in the rear room on the second floor, among whom was Veschi, went into the front room and commenced playing cards for beer. In the game played the leader on the winning side was called a "padrone," and he might

drink all the beer at stake himself, or give it to whomsoever he pleased. The defendant was not of the number who passed to the front room from the rear, although he was there at the time. During the game a dispute arose between the decedent and Veschi, either over the game, or in regard to the beer. When it commenced the defendant was still in the back room. So far as the record shows, the decedent and Veschi were the only persons who were engaged in the dispute or affray that followed. During their contention, Veschi's vest was torn. The proof tended to show quite clearly that, when the defendant came into the room where the decedent and Veschi were, he passed into a corner, placed his right hand on the hip pocket of his trousers, where he had a revolver, and said, "Keep away from me." This he denied. There was no evidence tending to show that any person attacked or sought in any way to injure him at that time, or that he was threatened, or, indeed, that he was at all involved in the dispute between the parties. The contention between the decedent and Veschi attracted the attention of the proprietors of the saloon, who went to the room where it occurred, and removed Veschi to the lower part of the building. Soon after the defendant went to the room below. He testified that while passing down the stairs he saw Giovanni Mechi, who said to him, "You look out to-night;" that he also saw Saro and Constanza, and that the decedent was talking to Constanza; that Constanza said to him, "Do you want a revolver," and the decedent answered, "I have a weapon from Italy here that will do just as well;" he said "he had a weapon from his father-in-law; that he didn't want no revolver." While in the barroom below, the defendant, with others, drank each a glass of beer, except that one of the number took a cigar, but whether it was the defendant or one the others does not clearly appear. While there, the subject of Veschi's torn vest was discussed, with some excitement upon the part of Veschi. Witnesses for the prosecution testified: That during this discussion the defendant said to Veschi: "Never you mind! To-night I will kill him myself. Never you mind! Somebody scratched your vest. I want to kill him myself to-night. You had better get done with the business. I will kill him myself to-night. Never mind about your vest getting torn! I am going to be in jail for

you to-night. I am going to kill somebody. " That when he made these statements he put his hand in his pocket, and, as some of the witnesses testified, pulled out his revolver.   Thereupon De Luna, one of the proprietors of the saloon, turned the defendant, Veschi, and Gaetano into the street.   In a short time the decedent, with a stranger, De Sando, Saro, and a number of others, came down stairs, and also passed into the street.   The decedent turned to go towards his home in company with his father-in-law.   At that time the defendant was standing on the sidewalk in front of De Luna's saloon near Veschi and De Sando.   Veschi said to De Sando that it was not right to have his vest torn so, to which De Sando replied: "You go, and I will speak for you.  Go on. Never mind that!   What are you doing there?   You had better go home.   Your wife is dead, and your child is going in the house of refuge, or in the orphan asylum. "   Thereupon the defendant went from the sidewalk to the middle of the street, and commenced firing his revolver.   De Sando said to him, "Don't you fire, because you will be at a loss. "   Defendant then fired his revolver twice at De Sando while he was on the sidewalk.   He next fired at the decedent's father-in-law, who was on his way home, or standing a little below the store next to the saloon.   He fired three times right along; then stopped a couple of minutes, and commenced to shoot again.   Some of the testimony was to the effect that he shot at a group of people congregated on the sidewalk. After the defendant began firing his revolver, the decedent went into the hallway of Barone's store and removed his coat.   While there, the defendant fired twice at the doorway, inside of which the decedent was standing.   The decendent than came out of the hall, and started towards the defendant with his hands up.   The manner in which his hands were held was a subject upon which evidence was given.   That by the prosecution was to the effect that they were held in a manner to indicate to a person of his nationality that he was unarmed, while the defendant's evidence tended to show that they were held in a way which indicated that his purpose was to attack him.   The latter testified that the decedent, as he approached, had a stiletto in his sleeve, the hilt or handle of which was in his hand.   There was no other evidence to that effect, while there was a great amount which tended to show

quite conclusively that he had no weapon. There was also evidence tending to show that as the decedent approached the defendant the latter said, "Get away from me [or, "Keep away from me"], or else I will fire," and that he at once fired, when the decedent was but a few feet distant; that the decedent fell, and died almost immediately. After the homicide, two bullets were found in the pilasters at the side of the hall door of the building occupied by Barone, and near the place where the decedent removed his coat. These bullets penetrated the wood about four or five feet above the doorsill. A bullet also passed through the window of the store, through a drum, into and through, or nearly through, three papers of tobacco which were upon the shelves. After the defendant shot the decedent, the former at once went to the house where he boarded, which was but a short distance from the place where this affray occurred. Soon after an officer went to the house, found him standing at the head of the stairs, searched him, found no revolver upon his person, arrested him, and took him and Veschi, who had also been arrested, to the police station. After leaving them at the station, the officers returned to the house where the defendant boarded, and began to search. They found the revolver in a peach basket near the point where the defendant was standing when he was arrested. It was partially covered by a piece of carpet. The officers also discovered several empty shells which were scattered about the room near the basket. The revolver had six chambers; was self-cocking and a self-ejector. It was 32 caliber, and the shells found fitted it. The prosecution proved that the ball shot by the defendant entered the brain of the decedent and caused his death.

On the trial the defendant was sworn as a witness in his own behalf. He denied that he put his hand upon his pocket or his revolver during the dispute between the decedent and Veschi in the room over the saloon. He also denied making the threats which were testified to by other witnesses as having been made after he went down stairs. He testified that, after he came down stairs and went into the street, he saw the people there; was frightened; that he was firing upon the ground; that he saw a piece of firewood in De Sando's hand; that he waved his revolver and fired five times, that when he began to fire, De Sando went inside,

and afterwards others were walking up and down, and he fired three or four times on the ground ; that then the decedent came towards him and said, " To-night I am going to kill you, " to which he replied, " I am firing on the ground, and, if you come towards me any further, I am firing towards you. " He also testified that the signs the decedent made when he approached him were the signs of the Mafia, and, as already suggested, that he had a stiletto up his sleeve, the handle of which rested in the palm of his hand.

To the indictment in this case the defendant pleaded not guilty. The theory of the defense was that the decedent, at the time of his death, was approaching the defendant for the purpose of doing him bodily harm, and that the defendant shot him in self defense. That the defendant killed the decedent by shooting him is not denied. Indeed, the defendant himself so testified. The only defense interposed was that the decedent was about to attack the defendant, and that he killed him in defense of himself. Under the evidence in this case, the question whether the defendant was acting in selfdefense when he shot the decedent was manifestly a question of fact for the jury. When one believes himself about to be attacked by another, and to receive great bodily injury, it is his duty to avoid the attack, if in his power to do so, and the right of attack for the purpose of self-defense does not arise until he has done everything in his power to avoid its necessity. People v. Sullivan, 7 N. Y. 396; People v. Carlton, 115 N. Y. 618, 623, 22 N. E. 257 ; People v. Johnson, 139 N. Y. 358, 363, 34 N. E. 920. In the last case it was said : " Before one can justify the taking of life in self-defense, he must show that there were reasonable grounds for believing that he was in great peril, and that the killing was necessary for his escape from the peril, and that no other safe means of escape was open to him. " It is obvious that under the doctrine of the authorities cited, it cannot be held, as a a matter of law, that the defendant was justified in killing the decedent in defense of his own person. The learned trial judge, in his instructions to the jury, stated the correct rule in regard to self-defense, and the evidence was clearly such as to justify the verdict. It is true, the defendant testified to a conversation which he claimed occurred between himself and Mechi, in which the

latter told him to look out for himself, and to hearing a conversation between Constanza and the decedent in regard to the latter's wanting a revolver. No other witness testified to these conversations. But, if we assume that they occurred, it by no means follows that the defendant was justified in shooting the decedent, under the circumstances disclosed by the evidence. No necessity for the defendant's remaining in the vicinity of the decedent or others after this threat was made is apparent. That he might have returned to his boarding place without fear or danger of attack seems clear. Indeed, it is quite apparent that, when he was approached by the decedent, he could even then have easily retreated to a place of safety, and avoided any contact with him and any necessity for committing a homicide. In any view that can be taken of this case, it seems clear that the court below properly disposed of it, and that the verdict of the jury is fully sustained by the evidence.

Most of the witnesses who were called upon the trial were Italians, unacquainted with the English language, and consequently had to be examined with the aid of an interpreter. At the commencement of the trial, when the question as to appointing an interpreter arose, the defendant's counsel stated to the court that, if the people were to have an interpreter, the defendant desired the court to designate one to be sworn for the defendant. The district attorney objected to the swearing of a second interpreter, and stated that one of the counsel for the defendant was acquainted with and understood the Italian language. The counsel referred to stated that his knowledge of the language was limited, and that he was not able to converse with the witnesses in the various dialects which they used. No second interpreter was appointed, and the defendant's counsel now contend that as the one appointed by the court, and sworn as such, left Italy at the age of 15 years, and admitted some lack of knowledge of the dialect spoken by the witnesses, the defense was seriously obstructed in the fair presentation of its theory of the case to the jury. We have examined the proceedings and evidence, the manner of its presentation and the acts of the interpreter, as disclosed in the record, but find no evidence of any lack of ability or integrity upon his part. Our examination has led us to the conclusion that the defendant

was as well, if not much better, protected against any error of the interpreter than was the prosecution.   Indeed, the record shows that the interpretation in this case, with slight exceptions, none of which is very important, was quite as complete and correct as could be expected.   Our attention is, however, specially called by the defendant to one instance where a question was asked of a witness, the answer given, and, when the interpreter was asked to interpret the answer, he stated that he did not remember what the witness said ; that he had forgotten.   We find in this circumstance nothing from which either unfairness or incorrectness can be properly imputed to the interpreter.   It must be remembered that the position he occupied was somewhat unusual to him, and necessarily was accompanied by embarrassment upon his part.   Under such circumstances, that he might forget the answer given by a witness, by reason of his attention having been called elsewhere, or for some other reason, should occasion no surprise.   It is conceded by the learned counsel for the defendant that, if mistakes in the translation occurred, they do not constitute legal error; but it is said that, at most, it was their purpose to call the attention of the court to that fact, as explaining any uncertainty in the evidence when it came to the ears of the jury, and to suggest that by reason thereof the case was one which entitled the defendant to have the facts fairly presented to the jury.   In other words, their only claim is that the facts were uncertain, owing to a lack of intelligence or fairness on the part of the interpreter, and hence it was the duty of the court to exercise the utmost care to present the case to the jury impartially ; and cite Sindram v. People, 88 N. Y. 196, 202, and Mc Kenna v. People, 81 id. 360, 362, as sustaining that claim. That it was the duty of the court to present the case to the jury farly must be admitted.   Consequently, nothing more need be said upon this question, as in the further discussion of it we shall assume that it was the duty of the court to fairly present to the consideration of the jury the facts established by the evidence. In the case of Sindram v. People the question of the statements of the court in its charge to the jury was under consideration. In the charge in that case the judge had used very strong language, and such as quite clearly indicated his opinion of the

testimony in the case. There this court held that no legal errors were contained in any portions of the charge excepted to, and it was said : "Comments upon the testimony, so long as the judge leaves all the questions of fact to the jury, and instructs them that they are the sole judges of matters of fact, are not the subject of legal exception." It was, however, added : "It is desirable that the court should refrain as far as possible from saying anything to the jury which may influence them either way in passing upon controverted questions of fact, and perhaps comments on the evidence might be carried so far as to afford ground for assigning error." In the Mc Kenna Case it was held that the court had no right to withdraw any portion of the evidence from the consideration of the jury, by charging that, if they believed certain witnesses, their verdict should be against the defendant. No such question is involved in this case. The defendant's criticisms of the charge of the court are confined chiefly to the concluding portion and other parts separated from their context. We have carefully and studiously examined the entire charge, and, while there are expressions contained in it which might well have been omitted, still, when taken as a whole, it does not, we think, present any reversible error, or any ground for granting the defendant a new trial, under the provisions of section 528 of the Code of Criminal Procedure. That section provides : "When the judgment is of death, the court of appeals may order a new trial, if it be satisfied that the verdict was against the weight of evidence or against law, or that justice requires a new trial, whether any exceptions shall have been taken or not in the court below." An examination of the record in this case renders it manifest that the verdict was neither against the weight of evidence nor against law ; nor do we find anything in the evidence or in the procedure which would justify us in holding that justice requires a new trial. Section 528 must be construed in connection with section 542 of the same Code, which declares that upon appeal the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties. The effect of these sections of the Code of Criminal Procedure has recently been under consideration by this court. People v. Hoch, 150 N. Y. 291, 301, 44 N. E.

976; People v. Youngs, 151 N. Y. 210, 223, 45 N. E. 460. The conclusion reached in those cases was that however great the latitude of power conferred upon this court by those sections, in capital cases, the power to order a new trial is not to be exercised by the mere appearance of some error to which no exception was taken, unless the substantial rights of the accused can be seen to have been affected by it, and hence justice demands a new trial. When this rule is applied to the alleged errors in this case, it becomes obvious that a new trial ought not to be granted. Many of the errors which were pressed upon us in the defendant's brief and upon the argument seem quite unimportant. Others were urged with an earnestness and ingenuity which, upon the argument, made them seem grave and serious. But when the record is carefully read, and the questions thus presented are examined in the light of all the facts and circumstances developed on the trial, much of their gravity and seeming importance is dispelled.

On the argument, the defendant's counsel earnestly contended that the proof failed to disclose that premeditation and deliberation which the statute requires to constitute the crime of which the defendant was convicted. As bearing upon this question, it may be well to remember that there was testimony to the effect that when the dispute or affray arose between Veschi and the decedent, in the room over the saloon, the defendant at once placed his hand upon his revolver, and warned the occupants of the room to keep away from him; that, after he went to the room below, he repeatedly threatened to kill the decedent, or to kill somebody; and that, upon hearing the conversation between De Sando and Veschi, he at once repaired to the center of the street, commenced firing at De Sando, then at Saro, and at the decedent,—thus showing that from the first he possessed a strong disposition to use his revolver, and an apparent disregard of, if not an intent to destroy, the lives of those around him. Afterwards, when the decedent approached him, the proof shows that from a half a minute to two minutes elapsed while he stood facing the decedent, threatening to shoot him if he approached nearer. The question as to the meaning of the terms "deliberation and premeditation," in this statute, has frequently been considered by this court. In Leighton v. People, 88 N. Y. 177, it was held that to bring a case within the statutory

definition of murder in the first degree, while there must be deliberation as well as premeditation, if the killing was not the instant effect of impulse; if there was hesitation or doubt to be overcome, a choice made, as the result of thought, however short the struggle, —it was sufficient to constitute the crime. In People v. Majone, 91 N. Y. 211, 212, the same question was under consideration, and Earl, J., said: " Under the statute, there must be not only an intention to kill, but there must also be a deliberate and premeditated design to kill. Such design must precede the killing by some appreciable space of time. But the time need not be long. It must be sufficient for some reflection and consideration upon the matter; for choice to kill or not to kill, and for the formation of a definite purpose to kill. And, when the time is sufficient for this, it matters not how brief it is. The human mind acts with celerity which it is sometimes impossible to measure, and whether a deliberate and premeditated design to kill was formed must be determined from all the circumstances of the case." The doctrine of these cases was subsequently affirmed by this court in People v. Conroy, 97 N. Y. 62, 76; People v. Hawkins, 109 id. 408, 17 N. E. 317; and People v. Johnson, 139 N. Y. 358, 34 N. E. 920. On the trial in this case the learned trial judge charged the jury in the language of these decisions. That he fully explained to them the elements necessary to constitute premeditation and deliberation, there can be no manner of doubt. Under the doctrine of the authorities cited, the charge of the court in this respect was proper, and the question whether there was sufficient premeditation upon the part of the defendant to constitute the crime of murder in the first degree was plainly a question of fact, and properly submitted to the jury.

The defendant, however, contends that the court erred in taking out his watch and illustrating to the jury a minute of time. The question which he was at that time discussing was whether there was sufficient time for such a degree of deliberation and premeditation as would constitute the crime of murder in the first degree. The proof was that the decedent stood in front of the defendant while he had his pistol in his hand, threatening to kill the decedent, from a half a minute to two minutes. Under these circumstances, we find nothing in the act of the court in conveying to

the jury a correct idea of time which would constitute either error, or any unfairness upon the part of the trial judge, and consequently it must be held that the defendant's exception to that act was not well taken.

The defendant also contends that during the trial the jury were subject to outside influences which were prejudicial to his interests. The record discloses, at most, that while the jury was in the charge of two officers they attended church,—the topic of the sermon being the prevalence of crime,—and that the officers, as soon as they discovered that anything might be said which could prejudice the jury, at once left the church with them. When this fact came to the knowledge of the court, it stated to the jurors that it had been informed that the minister occupying the pulpit at the church they attended took occasion to make remarks in reference to the prevalence of crime, and stated to them that, although he was informed that nothing was said in reference to the case, yet, out of extreme caution, he would say that no opinion expressed by the pastor should have the slightest weight or influence upon their minds, but that their verdict must be based solely upon the evidence produced before them. Again, at the close of the trial and at the request of the counsel for the defendant, the court charged that no opinion uttered by the pastor of the church which they attended must have the slightest weight upon their minds in forming their verdict. We find nothing in this circumstance which indicates either that anything was said in regard to the case, or that anything occurred to prejudice the jury against the defendant. In the case of People v. Gallo, 149 N. Y. 106, 43 N. E. 529, a somewhat similar question arose, and while a new trial was granted upon other grounds, and consequently the question does not appear in that case as reported, it appeared in the record, and this court held that it was insufficient to justify a new trial. We have reached the same conclusion in this case.

The learned counsel for the defendant, in their brief, have called our attention to a number of statements contained in the charge, and claim that they were unfair and tended to prejudice the jury against their client. No good purpose can be served by examining these portions of the charge in detail, as, after a thorough and careful examination of them in connection with the other parts of

the charge, we have reached the conclusion that they did not constitute reversible error, or a basis for granting a new trial upon the ground that justice requires it.

The counsel for the defendant also claimed on the argument that the second count of the indictment was for murder in the second degree. If that contention were held to be correct, we do not perceive how it is material at this time. But, be that as it may, it is evident that the second count was for murder in the first degree, and valid under many decisions of this court. In People v. Giblin, 115 N. Y. 196, 21 N. E. 1062, it was expressly held that various statutory changes in the definition of the crime of murder have not abrogated the common-law counts in indictments for that crime, and that an indictment in common-law form, stating the facts constituting the crime, and charging the killing to have been done by the defendant willfully, feloniously, and with malice aforethought, was sufficient to sustain a conviction of murder in the first degree, if the proof as to the manner of the commission of the crime brought it within one of the statutory definitions.

Having thus examined all the essential questions raised upon this appeal, and having found no error that would justify a reversal or the granting of a new trial, it follows that the judgment and order should be affirmed.

All concur.

Judgment and order affirmed.