## Court of Appeals.

### June 6, 1899.

## PEOPLE v. JOHN KENNEDY.

1. MURDER—SELF-DEFENSE.

Before a party can justify the taking of life in self-defense, he must show that there was reasonable ground for believing he was in great peril; that the killing was necessary for his escape, and that no other safe means was open to him.   When one believes himself about to be attacked by another, and to receive great bodily injury, it is his duty to avoid the attack if in his power to do so, and the right of attack for the purpose of self defense does not arise until he has done everything in his power to avoid its necessity.

2. SAME—PREMEDITATION.

If there was an intention to kill, which was deliberate and premeditated, and the killing followed, the crime was complete.

3. SAME.

Where the proof justifies a jury in finding that the homicide was intentional, and resulted from sufficient deliberation and premeditation to warrant a verdict of murder in the first degree, the court of appeals will not interfere with the determination of the jury upon the facts.

4. SAME—CHARGE.

The court will not be justified in disturbing the judgment below on the ground that the charge of the trial judge was not impartial, but was highly prejudicial to defendant, where the charge, when taken together, was fair, impartial and correct, both as to the law and facts, and was as favorable to the defendant as he was entitled to under the evidence.

5. SAME—MOTIVE.

Evidence that there had been a personal encounter between the defendant and decedent, in which the former had been practically defeated, and, humilated by his defeat and inspired by a spirit of revenge, returned to the place of the first affray and made a second attack, is sufficient to justify the jury in finding that the defendant had a motive for the commission of this offense.

6. SAME—COURT OF APPEALS.

It is not the province of the court of appeals to review or determine controverted questions of fact arising upon conflicting evidence, but that the jury is the ultimate tribunal in such cases, and with its decision the court may not interfere, unless it reaches the conclusion that justice has not been done. ·

7. SAME—CONFESSION.

If the defendant supposes that there is any conflict in the evi dence a to the circumstances under which his confe ssion was made, or as to whether it was voluntary or otherwise, he should request the submission of that question to the jury.

8. SAME.

Since the adoption of section 395 of the Code of Criminal Procedure, the test of admissibility of the statement of a party accused of crime, whether made in the course of judicial proceedings or not, is whether it was voluntarily made, and that is to be determined by its nature and the circumstances under which it was made.

9. SAME.

It is no ground for the exclusion of an admission by a prisoner charged with crime that it was made while he was under arrest, if shown to have been made voluntarily and without influences of promises or threats.

10. SAME.

A confession is admissible under the provisions of section 395, where there can be no pretense or claim that statements were made while the defendant was under the influence of fear produced by threats, or upon any stipulation by the district attorney that he should not be prosecuted therefor.

11. SAME.

District attorneys and other executive and administrative officers should remember that to be admissible statements made by one charged with or suspected of crime must be voluntary, fairly obtained, and not procured by inquisitorial compulsion or other improper means.

APPEAL from a judgment of the supreme court convicting the defendant of the crime of murder in the first degree, and sentencing him to punishment by death, to be inflicted in the manner provided by law.

Harry L. Taylor, for appellant.

Thomas Penney, for the People.

MARTIN, J.—That upon the 9th day of October, 1898, the defendant killed John Hummings by stabbing him with a dirk or clasp knife was plainly established and not denied. The only question litigated upon the trial was whether the homicide was committed under such circumstances as to constitute a crime, or whether it was justifiable. The claim of the defendant was that he was attacked by the decedent, and that he killed him in the lawful defense of his own person. Upon that issue the jury found against him. Before a party can justify the taking of life in self-defense, he must show that there was reasonable ground for believing he was in great peril, that the killing was necessary for his escape, and that no other safe means was open to him. When one believes himself about to be attacked by another and to receive great bodily injury, it is his duty to avoid the attack, if in his power to do so, and the right of attack for the purpose of self-defense does not arise until he has done everything in his power to avoid its necessity. People v. Constantino, 153 N. Y. 24, 47 N. E. 37 ; People v. Johnson, 139 N. Y. 358, 363, 34 N. E. 920 ; People v. Carlton,. 115 N. Y. 618, 623, 22 N. E. 257 ; People v. Sullivan, 7 N. Y. 396. Applying these rules to the proof in this case, it is. evident that the defendant's claim that the homicide was committed in his own defense cannot be sustained, as it was, under he evidence, at least a question of fact, and the finding of the jury is conclusive.

The first point presented by the learned counsel for the defendant in his brief is that the evidence was insufficient to justify the jury in finding the defendant guilty of murder in the first degree, because it failed to show any intent on the part of the defendant to kill the decedent, or that the act was perform-

ed with the premeditation and deliberation required to consti-tute that crime. Hence a brief epitome of the facts and cir-cumstances disclosed by the evidence seems necessary to the proper consideration of that question. The record discloses that the defendant is a colored man, who at the time of the homi-cide was living at No. 167 Elm street, in the city of Buffalo. He was then twenty-seven or twenty-eight years of age, and a waiter by occupation although he had not been steadily employed for some months anterior to that time. Between eight and nine o'clock on Sunday morning, the day of the homicide, the de-fendant and a friend, Reese Augustus, were engaged to some extent in drinking together. They then went to several places in the neighborhood where they resided, and on their way each stopped at a laundry to obtain his linen that had been left there. They then returned to the rooms they occupied upon Elm street, after which they had two more drinks of whisky, and at about ten o'clock the defendant left to take a walk in the neighbor-hood. After walking about two blocks he met Nellie Davis, a colored woman of his acquaintance, who was on her way to a room or tenement known as " No. Thirteen Gay Street," occu-pied by one Minnie Lewis. After a short conversation between the defendant and Nellie, the latter entered No. Thirteen, and was followed by the defendant. In the room which they en-tered there were the decedent and Minnie Lewis, who were in bed together, a woman whose real name was Fannie Truss, William Harris, Spencer Quarrells, and Robert Geen, all of whom were colored. While there, a dispute arose between the defendant and one of the women, whereupon Minnie Lewis asked him to leave, and attempted to force him to do so. A quarrel ensued, and he left the house, but picked up a bottle and returned to the doorway. The decedent then arose from the bed, put on a pair of trousers, and came to the door, where-upon a fight between him and the defendant commenced, and continued until some one called the police, when they separat-ed. During the encounter the defendant struck the decedent with a bottle, causing a slight wound upon his head. Although neither party was seriously injured, the advantage of the con-test seems to have rested with the decedent. When the parties

separated, the defendant went into Cotton's saloon, and from there to Guy street, then down Michigan to Vine street, and then to his room on Elm street. While there he changed his clothing, and soon after returned to Gay street, where the affray occurred. While returning he was warned not to go to the house where the fight took place. He, however, disregarded the warning, continued his course, and entered the room occupied by Minnie Lewis, where he found the decedent upon the bed, with Minnie Lewis sitting by his side, and Fannie Truss bathing his head with witch-hazel. When the defendant entered, the decedent arose, and another struggle followed. During the last encounter the defendant drew a long dirk or clasp knife which he then had, with which he struck the decedent repeatedly, inflicting several severe wounds, which resulted in his immediate death. The defendant then left the house, wringing the blood from his hands, and went to a saloon on the corner of Elm and Church streets, where, while he was washing, he was arrested. The knife with which he stabbed the decendent was left in his body. A wound was found upon the decedent's neck four inches in length, which severed several arteries, and which was of itself fatal. The defendant's knife and hat were found near the body. He admitted having killed the decedent, but claimed that when he returned to Gay street he was in search of Nellie Davis; that he opened the door and asked for her, whereupon the decedent jumped from the bed, declared that he would fix the defendant this time, and struck at him; and that thereupon they clinched, and the decedent attempted to strike him with a piece of iron, when he drew his knife, struck blindly at him, and thus inflicted the wounds which caused the decedent's death. Upon this evidence the defendant based his claim that he acted only in self-defense. The testimony of the witnesses called by the people was to the effect that the defendant entered the room with a rush, inquired for the decedent in indecent terms, whereupon the parties clinched, and very soon the defendant pushed the decedent from him, when the latter staggered and fell to the floor the blood, spurting onto the defendant, and the decedent soon expired. After the homicide no marks of the struggle were found upon the body of the de-

fendant, except a slight scratch between the thumb and index finger of his left hand. The knife with which the decedent was slain belonged to Reese Augustus, from whom the defendant borrowed it that day. Whether he obtained it before the first encounter, or afterwards, does not clearly appear from the record. The evidence upon the part of the people tended to show that it was procured after the first encounter, while the defendant claimed that it was obtained before that time, and for a legitimate purpose. We think the testimony was sufficient to warrant the jury in finding that it was procured after his first difficulty with the decedent. Under the evidence given upon the trial, it is quite obvious that the question whether the homicide was perpetrated under such circumstances as to constitute the crime of murder in the first degree was a question of fact for the jury. There was abundant evidence to justify the jury in finding that, after the first encounter, the defendant, in a spirit of revenge arising from chagrin or anger at his defeat, went to the room of his friend, obtained the knife, and returned, intending to kill the decedent. If, however, it be said that it is uncertain whether he obtained the knife at that time, or had obtained it previously for another purpose, still it is not very material, as in either event he had abundant opportunity between the first occurrence and the time of the homicide to form a premeditated and deliberate intent to commit the crime of which he was convicted. Moreover, he was cautioned by parties to whom he was known not to return, thus showing that it was evident to them that he was returning for the purpose of renewing his contest with the decedent. The facts and circumstances bearing upon this question were abundantly sufficient to justify the jury in finding that the defendant not only intended to kill the decedent, but that it was done with premeditation and deliberation.

This court has so often stated the rule as to the intent, premeditation, and deliberation necessary to constitute the crime of murder in the first degree, that it seems unnecessary to restate it at this time. If there was an intention to kill, which was deliberate and premeditated, and the killing followed, the crime was complete. People v. Majone, 91 N. Y. 211 ; Leigh-

ton v. People, 88 N. Y. 117; People v. Beckwith, 103 N. Y. 364, 8 N. E. 662; People v. Conroy, 97 N. Y. 76; People v. Hawkins, 109 N. Y. 408, 17 N. E. 371; People v. Johnson, 139 N. Y. 358, 34 N. E. 920; People v. Constantino, 153 N. Y. 24, 37, 47 N. E. 37; People v. Decker, 157 N. Y. 194, 51 N. E. 1018. Where the proof justifies a jury in finding that the homicide was intentional, and resulted from sufficient de-liberation and premeditation to warrant a verdict of murder in the first degree, this court will not interfere with the determina-tion of the jury upon the facts. People v. Sutherland, 154 N. Y. 345, 48 N. E. 518. The proof in this case was such as to justify the verdict, and consequently, under the principle of its former decisions, this court should not interfere upon the ground discussed.

The defendant also claims that the charge of the trial judge was not impartial, but was highly prejudicial to him. We have examined the entire charge, but find in it nothing which would justify us in disturbing the judgment below, or which requires special discussion. The charge, when taken together, was fair, impartial, and correct, both as to the law and facts, and was as favorable to the defendant as he was entitled to under the evi-dence. Under such circumstances, it is manifest that the de-fendant's claim in this respect cannot be upheld (People v. Constantino, 153 N. Y. 24, 47 N. E. 37), and that the judg-ment cannot be reversed on that ground. Moreover, we find no exceptions to the charge, and consequently no question of law is presented for our determination.

The next ground of the defendant's appeal is that the evidence of motive was insufficient to justify the jury in finding him guilty of the crime charged. We think this claim cannot be sustained. Although it may be conceded that evidence of mo-tive had an important bearing upon the question of the defend-ant's guilt, yet the claim that no motive was proved does not seem to be justified. There had been a personal encounter be-tween the defendant and decedent, in which the former had been practically defeated; and the jury may well have found that, humiliated by his defeat and inspired by a spirit of re-venge, he returned to the place of the first affray and made a

second attack. One of the usual incentives to the commission of crime is the desire of revenging real or fancied wrongs. We think the evidence was sufficient to justify the jury in finding that the defendant had a motive for the commission of this offense.

The defendant also asks this court to grant a new trial under the provisions of section 528 of the Code of Criminal Procedure, which provides that, when the judgment is of death, the court of appeals may order a new trial if it be satisfied that the verdict was against the weight of evidence or against law, or that justice requires a new trial, whether any exception shall have been taken or not in the court below. This section has often been considered by this court, and it has uniformly held that it is not its province to review or determine controverted questions of fact arising upon conflicting evidence, but that the jury is the ultimate tribunal in such cases, and with its dicision this court may not interfere unless it reaches the conclusion that justice has not been done. We are unable to reach any such conclusion in this case, and hence must decline to interfere upon that ground.

The only other question raised by the defendant arises upon his exceptions to the admission of statements previously made by him, which were permitted to be proved upon the trial. After his arrest he was taken to a police station, and in the afternoon of the day of the tragedy he was shown the knife with which the decedent was killed, and asked by Sergeant Holmlund if it was his, to which he replied it was. He was also shown the hat found near the decedent's prostrate body, and asked if it belonged to him, to which he answered in the affirmative. He was then taken upstairs to the police headquarters, where he was questioned, and his statements written out by a typewriter, signed by him, and verified by his affidavit. Upon the next day he was again interrogated in regard to the transaction, his answers were taken, committed to paper by a typewriter, signed by the defendant, and verified. These confessions, substantially corresponded with the testimony which was given upon the trial, except as to the manner in which he obtained the knife with which the homicide was committed. When the defend-

ant was upon the stand as a witness in his own behalf, he was cross-examined by the district attorney as to certain claimed discrepancies between the written statements signed and verified by him and his testimony given upon the direct examination. His verified statements were also offered and admitted in evidence under his objections : (1) " That it is incompetent and improper, and improperly and involuntarily obtained ; that this defendant was in a state of great mental disturbance and nervousness at this time, and was . not competent to give a statement voluntarily." (2) " Under section 395 of the Code of Criminal Procedure, that this alleged statement was made neither in the course of a judicial proceeding nor to a private person." (3) " That section 395 of the Criminal Code is unconstitutional, in that it deprives this accused, or any accused, of his rights, and unreasonably and unlawfully restricts them under section 6 of article 1 of the Constitution of the state of New York, and the fifth amendment to the United States constitution, which declares that no man shall be compelled to give testimony against himself in a criminal case." These objections were overruled, and an exception taken. The defendant's testimony as to what occurred when these statements were made, was, in substance, that he was taken upstairs into a large room, where a gentleman sat at the table with his back to the window, and had a chair in front of him, in which the defendant sat ; that one Haller was there ; that Holmlund sat by a window, and that a typewriter or stenographer was there who commenced asking him questions ; and that Holmlund, during the second interview, said to him that he could just as well tell him the truth, as it would save him (Holmlund) a lot of truble, and besides that, he could get twenty people who saw the defendant run across Michigan street to get his knife. He then testified that they questioned him until he supposed they got what they wanted, and added, " I was glad to tell them everything, because I had been bothered by people coming down stairs." He was then asked :  " What do you mean by that ?   A. After I got there, news was brought to me I had killed a man.   Of course, I didn't feel good about that. I didn't have any intention of killing anybody, and I was put in my cell, and didn't have anything on besides a pair of pants

and shoes, and I tried to sleep; and, every time I laid down, there was some one to see on some pretense or other. If I was laying down, they couldn't see my face, and they would make a noise and rouse me, and want to know how I do it, and all that kind of business. They kept me that way all that day, Sunday and Sunday night, Monday, and partly Monday night." Assuming the correctness of the defendant's testimony as to what transpired when his statements were made, the question is presented whether they were properly permitted to be used as evidence against him.

Although a difference has always existed between the civil and the common law in regard to confession made by persons charged with crime, the former regarding them as well-nigh conclusive, while the latter treats that species of evidence as open to distrust, still, as the latter has been adopted by the courts of this state, it is only the common law and statutes that need be considered in determining their bearing upon the question of the admissibility of the defendant's confessions in this case. The first case in this court, called to our attention, where the question has arisen, is Hendrickson v. People, 10 N. Y. 13. In that case, Parker, J., said : " The general rule is that all a party has said, which is relevant to the questions involved in the trial, is admissible in evidence against him. The exceptions to this rule are where the confession has been drawn from the prisoner by means of a threat or promise, or where it is not voluntary, because obtained compulsorily or by improper influence." There the defendant was on trial for murder, and it was held that his statements as a witness at the coroner's inquest, made before he had been charged with the crime and before it was ascertained that a crime had been committed, were admissible in evidence against him. In People v. McMahon, 15 N. Y. 384, where the defendant was arrested by a constable, without a warrant, on suspicion of having murdered his wife, and was taken before the coroner who was holding an inquest, and was sworn and examined as a witness, it was held that the evidence thus given was not admissible on the prisoner's trial for the murder. People v. Wentz, 37 N. Y. 303, is to the effect that the confessions of a prisoner, voluntarily made, are admissible

as evidence against him, although made to a policeman while the prisoner was not in his custody, although arrested and confined in jail. In Teachout v. People, 41 N. Y. 7, it was decided that the statements made by a prisoner under oath at a coroner's inquest were admissible against him upon his trial for murder, although he knew at the time he was sworn that the decedent was poisoned, and that he would probably be arrested for the crime, and was informed that rumors implicated him, and that he had a right to refuse to testify. In Murphy v. People, 63 N. Y. 590, after the prisoner's arrest and commitment to jail, he was brought to the sheriff's office and made certain statements, as to which the witness was permitted to testify under objection. It appeared that the prisoner was asked by the officer making the arrest if he desired to make any statement as to his whereabouts on the day of the murder, and the witness replied he did, and then made the statement testified to. It was offered in evidence on his trial, and it was held by this court that the statement was voluntary, the reception thereof did not constitute error, and that a statement made by a prisoner is not involuntary because made after his arrest, and while in the custody of the officer arresting him. Cox v. People, 80 N. Y. 500, is to the effect that evidence of confessions made by a prisoner, after his arrest, to the police officer making it, when not induced by any promise or threat, and voluntary upon his part, is competent, and that it is not sufficient to exclude a confession that the prisoner was under arrest at the time. or that it was made to the officer in whose custody he was, or in answer to questions put by him. In People v. McGloin, 91 N. Y. 241, a statement or confession made by the prisoner was offered in evidence on part of the prosecution. He was arrested by an inspector of police in the city of New York, who informed him of the crime for which he was arrested, that he was an inspector of police, had been watching him since the homicide, told him of his having tried to steal a barrel of whiskey the night before, and about pledging his pistol with which the murder was supposed to have been committed, whereupon the prisoner said that he would make a statement. A coroner was sent for, who came to police headquarters where the prisoner was in custody, and a

confession was made in the presence of the coroner, who acted as clerk to take it down and prove it. It was there held that as the evidence did not disclose any threat, nor authorize an inference that the confession was made under any influence of fear, it was not a compulsory statement, and was properly received in evidence, although sworn to by the accused. In People v. Mondon, 103 N. Y. 211, 8 N. E. 496, the defendant, who was an ignorant Italian, unfamiliar with the English language, was arrested, without warrant, as a suspected murderer. While under arrest, he was taken before a coroner's inquest, and, after proof of the homicide, was examined on oath by the district attorney and the coroner as to circumstances tending to connect him with the crime. It did not appear that he was informed that he was not bound to answer questions tending to criminate himself. On his trial for the commission of the crime the prosecution was permitted to prove, under the objection and exception, the statements so made by the prisoner. This was held error, upon the ground that the evidence sought to be excluded was not a confession, but an official examination on oath of the prisoner while in custody. Still, in that case the doctrine of the Hendrickson, McMahon, and Teachout Cases was considered and practically reaffirmed. The question again arose in People v. Chapleau, 121 N. Y. 266, 24 N. E. 469, where it was held that, since the adoption of section 395 of the Code of Criminal Procedure, the test of admissibility of the statement of a party accused of crime, whether made in the course of judicial proceedings or not, is whether it was voluntarily made, and that is to be determined by its nature and the circumstances under which it was made. It was also held that it is no ground for the exclusion of an admission by a prisoner charged with crime that it was made while he was under arrest, if shown to have been made voluntarily and without influences of promises or threats. In that case the statement was made before a coroner after the defendant was informed as to his right to depose or not, and that the deposition might be used against him. He was then sworn, and made a statement, but upon the following day denied having made it, and refused to sign it. It was, howver, received in evidence and held admissible. In People v.

Wright, 136 N. Y. 625, 632, 32 N. E. 629, it was held that, under ·the recent decisions of this court, there was no error in proving the defendant's declarations when examined before the coroner.    This conclusion seems to have rested upon the Chapleau Case, and the cases cited in the opinion therein.    In People v. Cassidy (N. Y. App.) 30 N. E. 1003, confessions by the defendant were made, while he was under arrest, to Inspector Byrnes, of the New York police force.    The inspector and others present testified that the ·confessions were voluntary. The defendant testified that they were made under the influence of fear produced by threats.    The q 1estion whether they were voluntary and reliable was submitted to the jury by the court, which found against the defendant; and it was held that they were properly in the case, and sufficient to justify the verdict. In People v. McCallam, 3 N. Y. Cr. R. 189, after the defendant knew she was suspected of the crime for which she was tried, she was told by an officer that they had found enough to convict her, and she might as well own up.    It was held that this declaration did not constitute a threat, and that the confession of the defendant was voluntary and admissible.    People v. Mackinder, 80 Hun, 40, 29 N. Y. Supp. 842.

If the defendant supposed there was any conflict in the evidence as to the circumstances under which his statements were made, or as to whether they were voluntary or otherwise, he should have requested the submission of that question to the jury.    No such request was made.    We think, as the defendant's counsel evidently did upon the trial, that no such conflict existed, and the question whether the statements were voluntary and admissible, under the provisions of section 395, was for the court, and not for the jury.    When we test the question as it arises on this case by the authorities cited, it becomes quite manifest that the defendant's exceptions were not well taken.    Obviously the statements were admissible under the provisions of section 395, as thsere can be no pretense or claim that they were made while the defendant was under the influence of fear produced by threats, or upon any stipulation by the district attorney that he should not be prosecuted therefor.    Moreover, there was no evidence that the statements were in any degree compulsory, or

that they were induced by any improper influence whatsover. While it is true that the defendant was under arrest when they where made, still they were not the result of an examination in any judicial proceeding. Nor could he have supposed that he was required to make any statement whatever, except such as was entirely voluntary upon his part. It is true, he was not informed by those interrogating him that what he said might by used against him upon a subsequent trial. Still, he must have understood such to have been the case, as he was a man of ordinary intelligence and education. Indeed, if we adopt his own version of the circumstances under which his statements were made, we find nothing in the nature of compulsion or improper influences, or of a promise or threat by which they were induced. At the second interview, Holmlund said to the defendant that he could just as well tell the truth, as it would save him (Holmlund) a lot of trouble, and besides, he could get twenty people who saw him run across Michigan street toward it (evidently referring to the knife). This falls far short of constituting compulsion or improper influences, or a threat or promise to the defendant. There was in this statement nothing from which such a conclusion could be drawn. Besides the defendant, in substance, testified that he was glad to tell the officers everything, because he had been bothered by the people; then explaining why he was glad to give the officers the information he did. Thus, it is manifest that these statements were purely voluntary, and procured by no means which would justify a determination that they were involuntary, and consequently inadmissible. This case is clearly distinguishable from the case of People v. Mondon, and other kindred cases upon which the defendant relies. In those cases the confessions of statements were obtained in a proceeding of a judicial character, or where the defendant may well have understood that he was required to testify, and was not instructed as to his right to decline an answer, or that his statements might be used against him. Here they were statements made to the officers having him in charge, were not given as evidence, but were voluntary, and although reduced to writing, signed by him, and verified, amounted, at most, to a mere admission upon his part. Under these circum-

stances, his statements, and the evidence as to what he said, were, we think, clearly admissible, under the principle of the authorities to which we have referred.

While cases will doubtless arise in the future, as they have in the past, where public officers, by inquisitorial and compulsory examination, may obtain from persons suspected of or charged with crime statements which it would be error to admit in evidence against them, still this is not such a case, as there was no proof that the defendant's statements were other than voluntary, and made with a full understanding of his situation and an exact comprehension of his rights. The proof is quite to the contrary. In passing, it may be proper to observe that, when officers charged with the enforcement of the law, through undue zeal or an inordinate desire to obtain evidence to convict, by covert threats, doubtful and uncertain promises, acts of intimidation, or other questionable means, procure incriminating statements from persons subsequently charged with crime, they are inadmissible, as they would be regarded as involuntary and not made without inducement or practical compulsion. The reception in evidence of statements thus obtained might well be a ground for reversal. Therefore district attorneys and other executive and administrative officers should remember that, to be admissible, statements made by one charged with or suspected of crime must be voluntary, fairly obtained, and not produced by inquisitorial compulsion or other improper means. When properly procured, they may be of value, and employed as evidence against the person making them; but, if procured otherwise, they are not admissible, and a judgment influenced by such evidence would require reversal.

Having thus examined all the exceptions to which our attention has been called by the defendant, and finding none which would justify a reversal, it follows that the judgment should be affirmed.

All concur (BARTLETT, J., in result).

Judgment affirmed.