THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
against GIRO LIGOURI and WILLIAM PANARO, Appellants.

Argued October 9, 1940; decided December 4, 1940.

*Harry G. Anderson* and *Samuel Bader* for Giro Ligouri, appellant.

*Harry G. Anderson* and *Samuel Bader* for William Panaro, appellant.

*William O'Dwyer, District Attorney* (*Henry J. Walsh* of counsel), for respondent.

SEARS, J.   The defendants, Giro Ligouri and William Panaro, were indicted together for the crime of murder in the first degree.  They have been found guilty by the verdict of a jury of the crime of murder in the second degree. Their convictions have been unanimously affirmed by the Appellate Division in the second department, and are brought before this court by an order granted by one of the judges of this court.

It is not disputed by either appellant that Ligouri, on October 24, 1938, shot and killed Nicholas Cosaluzzo.  In fact, Ligouri, himself, sworn in his own behalf, testified to the shooting.  The affair occurred about three o'clock in the afternoon in a public street in the borough of Brooklyn, New York city, at or near the corner of McDonald avenue and Avenue X.

In the latter part of September or early part of October, 1938, Ligouri, while taking part in a dice game, was held up and robbed of some money by two hooded men.  One of the robbers was the deceased, Cosaluzzo; the other, a man named Gallo, who was sworn as a witness upon the trial.  After this occurrence, Ligouri's first meeting with the deceased of which we have proof, took place on the day of the fatal shooting about an hour earlier.  Ligouri and Panaro had gone to a street near McDonald avenue, several blocks north from the place where the shooting later occurred, to place a bet.  There they met the deceased and Gallo. Proof of what took place at this meeting is conflicting. On these facts, however, there is accord; the deceased and Gallo had left Gallo's automobile; deceased came to the

side of the automobile in which Ligouri and Panaro were sitting, and the deceased and Ligouri talked. Gallo testified that Ligouri beckoned to the deceased and when he came over, Ligouri asked him a question which he answered with an oath that it was none of Ligouri's business. Ligouri testified that the deceased came over to the automobile in which he and Panaro were sitting and asked him whether he knew the speaker or knew Gallo and that he answered in the negative but said, " I surmise who you are," whereupon the deceased said, " I'll be seeing you soon." After this conversation Ligouri and Panaro drove to Ligouri's house which was near McDonald avenue and Avenue X, and the deceased and Gallo drove to the deceased's home and later to a restaurant on McDonald avenue and Avenue U, about six blocks from Avenue X. From there, Gallo testified, the deceased took Gallo's car at about three o'clock and drove toward Avenue X. When recalled by the defense, Gallo testified that at about a quarter before three o'clock he made a telephone call for Ligouri on behalf of the deceased, and that after the speaker at the other end of the telephone line said that it was Ligouri speaking, the deceased, himself, took the telephone. Gallo did not give the conversation which the deceased had with Ligouri, but Ligouri testified that he was called to the telephone by a man named Criscuola while he was playing with one of his children in the hallway of his home; that he went to the telephone, which was in a candy store on the corner of McDonald avenue and Avenue X, and that the man calling identified himself to Ligouri by giving his name and by saying that he was the fellow with whom Ligouri had just been talking. Further, according to Ligouri, the deceased said, " If you don't come down here, I'm coming down to get you." Ligouri said that he then went home and got two pistols. He explained this by saying that he " figured on getting Panaro to help him out because he figured that they were coming down in a mob because he (deceased) told him he would be down there."

Ligouri and Panaro went back to the corner of McDonald avenue and Avenue X. As they reached the corner they saw Cosaluzzo drive up in an automobile. Both testified that as he got out of the car he put a gun in his pocket, and that as he walked toward them, he said to Panaro, " Get the hell out of here. I don't want to see you." Panaro, according to the testimony of both Ligouri and himself, then walked away at least a few steps. Ligouri testified that the deceased said, " Come around the corner. I want to talk with you," and that he replied by saying, ' Listen, Nick, let's talk this over. Let's go in the ice cream parlor and have a soda and talk it over. You caused enough trouble." The deceased declined the invitation and an acrimonious discussion arose. According to Ligouri's statement on the witness stand, and that of Panaro, the deceased drew a gun and pointed it at Ligouri's face and snapped the trigger. Thereupon, Ligouri pulled out his guns, " the two of them," and as described in his own words, " I just put it up, shot once and kept shooting." Ligouri said that after the shooting he hurried away, joined Panaro around the corner and besought Panaro to stay with him, saying, " Come on, Willie, keep me company because I'm afraid. I think I killed Nick."

While no other witnesses testified directly as to any happenings occurring immediately before the shooting, two witnesses, sworn on behalf of the People, gave testimony inconsistent in some degree with that already referred to. Adrian Gillam, a man employed by the Brooklyn Borough Gas Company as a service man, told of driving his automobile near the scene of the shooting at the time it occurred. As he arrived at the corner of the two streets, he heard a noise that sounded like the backfiring of an automobile. He continued to drive northerly on McDonald avenue, where he saw two men pursuing and shooting at another man. He did not see the guns in their hands. All three men were ahead of him and running in the direction that he was going. The man pursued was bent over, his arms folded across his abdomen, he was stumbling and finally

fell near a billboard, where deceased was picked up. Gillam heard as many as eight shots discharged. The pursuers went into the vacant lot beyond the billboard and disappeared, and the witness continued on his way passing by the billboard. He could not identify any of the men.

Guiseppi Scalli, a street sweeper, was at the time of the shooting under the stairway of the elevated railway station on McDonald avenue near Avenue X. He heard several shots discharged. Turning around, he observed a man on the ground near the billboard on McDonald avenue with two other men, one to the right and the other to the left of the prostrate man, who lay on his back. One of the two men who were standing there was shooting at the fallen man and fired four or five shots. After the two men passed beyond the billboard and disappeared, the witness went over to the man on the ground and lifted his head. He summoned the police.

Nine bullets had been discharged into the body of the deceased, some apparently were fired into his back. A revolver, concededly belonging to the deceased and seen in his possession by his brother an hour and a half before the shooting, was found on the ground beside the fallen man.

Another witness for the People, Criscuola (the man who Ligouri said called him to the telephone), testified that just before the shooting he was at the corner of McDonald avenue and Avenue X and saw an automobile make "a four corner turn" on Avenue X; the man in the car motioned to someone on the corner; the defendants were near him, and they walked toward the car which stopped at the billboard on McDonald avenue, a short distance northerly from the corner of Avenue X and beyond the steps of the elevated railway station. He further testified that the defendants told him before the shooting to get off the corner as there might be some trouble. The witness walked away on Avenue X and "heard a lot of noise * * * like backfiring or shots." He saw the police coming, and went home.

After the shooting the defendants fled to Jersey City. A " couple of days " afterwards, Criscuola received a message in response to which he went to Jersey City and met the defendants. Criscuola at this meeting asked Ligouri what had happened and Ligouri said, referring to the man who was killed, " that was one of the guys that stuck him up." As to a conversation had with Panaro at the same time, the witness' testimony on direct examination was as follows: " Q. Did Willie Panaro say anything? A. He just told me to go to his mother's house and tell his mother that he was getting a job on the Fair and not to worry. Q. Did you ask Willie what had happened on the 24th of October? A. Well, as a matter of fact — (By the court) Q. Yes or no? A. Yes. Q. (by the Assistant District Attorney) What did he say to you and what did you say to him? A. I asked him what happened there that afternoon. He said that was one of the guys that stuck Giro Ligouri up, and they let him have it. I asked him why they did that. He said that he tried to pull a gun on them."

On cross-examination, Criscuola testified that it was Ligouri who said that the man drew a gun on him and " We let him have it " and that it was not Panaro who said this.

Such, in brief, are the main facts bearing on the guilt of the defendants.

The defendant Ligouri urges that the trial court in its charge in respect to justification committed error. The court was requested on behalf of Ligouri to charge in this language: " If the defendant Ligouri was attacked feloniously by the deceased, Cosaluzzo, the defendant Ligouri had a right to shoot Cosaluzzo." The court declined to charge as requested, stating that it had already been covered. Defendant continued, " I ask Your Honor to charge the jury that a person who is feloniously attacked is under no obligation to retreat but may stand his ground, and if necessary, kill his opponent." This the court declined, saying, " If a person kills another whom he claims assaults him, he is under an obligation to retreat as far as possible, unless the circumstances are such that unless he acted as he did

he would be the recipient of irreparable and grievous bodily harm." Exceptions were taken to the court's declining to charge as requested and to the charge. In the main charge the court had said on the subject of self-defense: " The defendant Ligouri claims that while he discharged these revolvers, what he did was done in self-defense. As I have already said, the law is that an act otherwise criminal is justified when done to protect the person committing it, or another whom he is bound to protect, from inevitable and irreparable personal injury, and the injury could only have been prevented by the act, nothing more being done than is necessary to prevent the injury. A person who is attacked before he can resort to acts which result in death, is bound to retreat and to avoid the attack, unless the circumstances be such that he believes that he is in such imminent danger of irreparable injury, and the only thing he could do to protect himself and prevent that injury being inflicted upon him, would be to act as he did, and to do no more to prevent it than was necessary. If the circumstances justified the belief on his part that he is in danger of inevitable and irreparable injury, although it should turn out he was mistaken, an ordinarily prudent man under the same circumstances would be justified in doing what he did, if he thinks he is in danger of death. If you believe that Nick unexpectedly pulled this gun and snapped it on him, and under those circumstances he felt the only thing for him to do was to do what he did, discharge and empty both of his guns into him, even though death resulted, that would be justifiable under the law, but he could not do more than necessary, more than what an ordinarily prudent man under the same circumstances would be justified in doing. He does not have to satisfy you that the situation existed, but if, upon considering all the evidence in the case, there is a reasonable doubt, he must have the benefit of it, and your verdict will be not guilty, because the People must establish to your satisfaction beyond a reasonable doubt that this was a wilful, wanton killing, and was not excusable and not justifiable. That is their burden."

The applicable statute, Penal Law, section 1055, contains the following language:

" Homicide is also justifiable when committed:

" 1. In the lawful defense of the slayer, or of his or her husband, wife, parent, child, brother, sister, master or servant, or of any other person in his presence or company, when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony, or to do some great personal injury to the slayer, or to any such person, and there is imminent danger of such design being accomplished; or,

" 2. In the actual resistance of an attempt to commit a felony upon the slayer, in his presence, or upon or in a dwelling or other place of abode in which he is."

The language employed by the court in the main charge is that applicable in the usual case of self-defense and falls within the first subdivision as above cited. (*People* v. *Governale*, 193 N. Y. 581, 587, 588.) This is not, however, the ordinary case. Here, on the assumption in the request, a felony was in process of being committed. So in substance the court charged. To avoid the felonious aggression against his person, if it occurred, Ligouri was justified under the second subdivision of the section in standing his ground and, if necessary, destroying the person making the felonious attack. (*People* v. *Tomlins*, 213 N. Y. 240; *People* v. *Fiori*, 123 App. Div. 174, 188.) " General statements to the effect that one who is attacked should withdraw, must be read in the light of the facts that led up to them." (*People* v. *Tomlins, supra,* p. 245. Cf. *People* v. *Johnson*, 139 N. Y. 358; *People* v. *Constantino*, 153 N. Y. 24; *People* v. *Kennedy*, 159 N. Y. 346; *People* v. *Governale, supra; People* v. *Lumsden*, 201 N. Y. 264.) To the facts in this case the language of Mr. Justice Holmes in *Brown* v. *United States* (256 U. S. 335, 343) is particularly applicable: " Detached reflection cannot be demanded in the presence of an uplifted knife."

We reach the conclusion that error occurred in the refusal of the trial court to charge as requested. It may be argued

that the charge amounted to granting the request as no one could consider escape as reasonably possible from a pistol purposefully and directly aimed at the assailed. The charge, however, left this matter to deduction. The defendants were on trial for crimes punishable by death. They were entitled to have the judge charge the jury definitely and directly that if they found that the felonious assault, assumed in the request, was occurring, the defendant against whom it was being perpetrated was justified in killing the felonious aggressor if such were necessary in resisting the assault. This error goes to the very foundation of the defense, and necessitates a reversal of the conviction of Ligouri.

Error was concededly committed by the People in producing on rebuttal evidence to contradict the defendant Ligouri's testimony on a collateral issue brought out on his cross-examination by the People. (*People* v. *Perry*, 277 N. Y. 460.) Alone this might not be considered of sufficient importance to require the reversal of the judgment of conviction.

As to the defendant Panaro, his conviction must also be set aside, both because it falls with the reversal of the conviction of Ligouri and because there has been a failure of requisite proof of guilt to justify the verdict as to him. He was with Ligouri before the shooting, accompanied him to the place where the tragedy occurred and fled with him. That is all that was established beyond a reasonable doubt. Such proof falls far short of establishing that he aided, abetted or otherwise participated in the homicide.

For these reasons the judgments should be reversed and a new trial ordered as to both defendants.

LEWIS, J. (dissenting). Without repeating facts descriptive of the homicide, which are accurately stated in the prevailing opinion, I have reached the conclusion that as to the defendant Panaro the record of proof is not sufficient to establish beyond a reasonable doubt that he aided, abetted or participated in the killing of Nicholas Cosaluzzo. His conviction should be reversed and the indictment, as to him, should be dismissed.

As to the defendant Ligouri — I find ample proof of his guilt of the crime of which he stands convicted. In the circumstances which surrounded the tragedy the conceded fact that nine bullets were discharged into the body of Cosaluzzo from two revolvers in the hands of Ligouri, three of which bullets entered the back of the deceased, was sufficient to belie Ligouri's claim that he acted in lawful self-defense.

Passing to Ligouri's challenge to that portion of the court's charge relating to the law of self-defense, " The test is always whether the jury, hearing the whole charge, would gather from its language the correct rules which should be applied in arriving at decision " (*People* v. *Russell*, 266 N. Y. 147, 153). I believe the rules applicable to the facts here involved were correctly charged. When the evidence closed Ligouri had testified that just prior to the homicide, Cosaluzzo, " pulled out his gun and put it towards me," and that thereupon " I pulled out my guns, the two of them * * * I just put it up and shot once and kept on shooting." The court charged the jury that the act of the deceased Cosaluzzo constituted a felonious assault upon Ligouri. There was thereupon submitted for the jury's determination the question whether in the circumstances surrounding this incident the defendant could justify his act under the law of self-defense. Upon that subject the jury was instructed: " The defendant Ligouri claims that while he discharged these revolvers, what he did was done in self-defense. As I have already said, the law is that an act otherwise criminal is justified when done to protect the person committing it, or another whom he is bound to protect, from inevitable and irreparable personal injury, and the injury could only have been prevented by the act, nothing more being done than is necessary to prevent the injury. A person who is attacked, before he can resort to acts which result in death, is bound to retreat and to avoid the attack, unless the circumstances be such that he believes that he is in such imminent danger of irreparable injury, and the only thing he could do to protect himself

and prevent that injury being inflicted upon him, would be to act as he did, and to do no more to prevent it than was necessary  *  *  *.  If you believe that Nick unexpectedly pulled this gun and snapped it on him, and under those circumstances he felt the only thing for him to do was to do what he did, discharge and empty both of his guns into him, even though death resulted, that would be justifiable under the law, but he could not do more than necessary, more than what an ordinarily prudent man under the same circumstances would be justified in doing." At a later point the court charged: " If a person kills another whom he claims assaults him, he is under an obligation to retreat as far as possible, unless the circumstances are such that unless he acted as he did he would be the recipient of irreparable and grievous bodily harm."

Believing this charge to be in accord with applicable law (Penal Law, § 1055; *People* v. *Governale*, 193 N. Y. 581, 588; *People* v. *Kennedy*, 159 N. Y. 346, 348; *People* v. *Constantino*, 153 N. Y. 24, 31; *People* v. *Johnson*, 139 N. Y. 358, 363), I conclude that the conviction of the defendant Ligouri should be affirmed.

LEHMAN, Ch. J., LOUGHRAN and RIPPEY, JJ., concur with SEARS, J.; LEWIS, J., dissents in opinion in which FINCH, J., concurs as to Ligouri but concurs in the grant of a new trial to Panaro; CONWAY, J., concurs in the opinion of LEWIS, J., as to Ligouri but votes to affirm as to both defendants.

Judgments reversed, etc.