## Court of Appeals.

April 7, 1896.

## PEOPLE v. FRANK GALLO.

CRIMINAL LAW—MISCONDUCT.

> Where, during the trial of an indictment for murder, the jury, under the direction of the court and in the absence of the defendant and his counsel, visited the saloon where the homicide occurred and which was kept by a witness for the people, and while there the witness conversed with them, offered them cigars which some of them accepted, and made statements upon disputed questions in the evidence, and the jury became separated during the time, it constitutes such misconduct on the part of the jury as to prejudice the defendant and affect his substantial rights.

Appeal from a judgment convicting defendant of murder in the first degree, and from an order denying a motion for a new trial.

John D. Lynn, for appellant.

Fred C. Hanford, for the People.

MARTIN, J.—The defendant was indicted for the crime of murder in the first degree. The indictment contains two counts. In the first it is alleged that the defendant, on the 25th day of August, 1894, shot and killed James Bovenze, in pursuance of a deliberate and premeditated design to effect his death. In the second, the killing of the decedent by the defendant is alleged to have been committed by an act eminently dangerous to others, and evincing a depraved mind, regardless of human life, although without a premeditated design to effect the death of any individual. The defendant was brought to trial upon this indictment at the Monroe county oyer and terminer on the 14th of January, 1895. The trial was concluded on the 17th of the month, and resulted in the defendant's conviction of the crime of murder in the first degree. The homicide occurred at about 11 o'clock in the evening of Sunday, the 26th day of August, 1894, in a saloon kept by Fred Lorenze, in the city of Rochester. The de-

fendant and the decedent were both Italians. The former had lived in this country about thirteen years, and the latter about seven. They had known each other three years prior to the homicide, and had been warm friends. At the time of the tragedy there were in the saloon the defendant, the decedent, Joseph Bovenze, Frank Renardo, Fred Lorenze, Mrs. Lorenze and Angelo Gillette, and there were in the room back of it three or four other people. During the day the defendant, the decedent, Joseph Bovenze, Renardo, and several others had been drinking beer at their house on Litchfield street. The decedent had purchased an eighth of a barrel of beer, which had been drank by them. In addition to this, there had been considerable drinking by them at Lorenze's saloon during the latter part of the day and evening. The defendant carried a revolver, and had for several months. The people introduced evidence which tended to show that at times during the day and evening of this occurrence the defendant "looked mad;" that he would not go to dinner, and, at some time during the evening, said to the decedent, "Talk about me, but don't talk about my sister;" that he tore up his hat with his teeth, and threw it on the floor; that there had been some misunderstanding between the defendant and the decedent in regard to the expenses of his sister in coming to this country with a view of her marriage to the decedent, and that during the afternoon he was asked if the decedent was going to marry his sister; that he first replied, "Yes," and then said "No; he is not a man; I think he is not talking right when he is talking to anybody;" that once when he was asked to eat or drink he refused, saying that he had business to attend to that day, and that when the decedent came to the saloon the defendant stood by the bar with his hat drawn over his eyes, looking towards him, but did not speak to him.

What transpired at the time of the homicide, as testified to by the witnesses for the people, was in substance that: After several drinks of cider had been taken by the parties then in the saloon, the proprietor said: "You people better go home. It is getting late. I want to close up." That Joseph Bovenze then said to the decedent, "Come on, let's home, because it is late.' That all started to go, Joseph Bovenze being ahead, the decedent behind him, and Frank Renardo behind, but on one side of the

decedent, when Joseph Bovenze said to the defendant, "Don't you want to go home?" That he replied, "I don't want to go. If I want to go to bed, there is a bed here for me." That just as Joseph Bovenze started to open the door, he turned around, and said to the defendant, "You need not put your hand to your hind pocket, because we ain't afraid of you." That then a shot was fired, after which the parties leaving all turned around, and two other shots followed. That the shooting was done by the defendant, who immediately ran into the back room, with Joseph Bovenze following him. That the decedent fell, and was found to have been shot. That the wound inflicted was fatal, and from its effects he died the following afternoon. That immediately after these shots were fired, policemen entered the saloon, and took all the parties there present to the police office. That the defendant ran upstairs, obtained another hat, jumped from a window, and was subsequently arrested while going towards his home. That his revolver was found in his pocket, but contained no cartridges. That he was then taken into the presence of the decedent, who was asked if the defendant was the man who shot him, to which he replied he was. That the defendant then said, "Me shoot you," the people claiming it was said in a manner indicating an assertion, while the defendant claimed that it was an ejaculation of surprise; and that he was then taken into the presence of Joseph Bovenze, who said, "That is the man," and the defendant replied, "You lie, you son of a————." Upon their cross-examination all the people's witnesses testified that the defendant and the decedent were warm friends, had always been good friends up to the time the decedent was shot, and that there was no quarrel between them at or preceding that time. Indeed, their evidence tends to show that the relations between the decedent and the defendant had been unusually pleasant, and that no quarrel or disagreement had ever existed between them.

The defendant was called as a witness in his own behalf. After testifying that the business he referred to that day was hunting for a house, and as to the amount of drinking that had been done by himself and the other parties who were present, he testified that, after paying for the drinks he had purchased, he started from the counter to go towards the door, when the decedent and his

brother Joseph took hold of him, to prevent his leaving, and desired him to drink more ; that he said he wanted nothing more, it was getting time for him to go home, as he had to go to work the next day; that they pulled him back, and more drinks were purchased, but he took a cigar; that after that the decedent said to him, "Let us go," and he told them to go, that he would come by and by ; that the decedent again asked him to go, and he told him that they could go, he would stay there, and Lorenze then said : "You fellows can go, and if Frank wants to stay, there is a place for him here;" that Joseph then turned to his brother, and said : "Let that darn stinker go, the dam son of a bitch, before I cut his head off;" that the defendant asked, "What for?" to which Joseph replied, "You ain't good enough to be with us;" that after Joseph had called him those names, he asked him why he said he was not good enough to be with them, when Joseph immediately drew a razor, and struck him on the side of the head, and kept striking him continually; that he tried to get the razor with his left hand, and was struck on the finger; that he was struck three times upon the side of the head, over the eye, and upon the finger; that he thereupon took his revolver, and shot in the air to scare him; that the others present then took hold of him, took the revolver out of his hand, and while doing so the other two shots went off; that Mrs. Lorenze got hold of Joseph and said to him, "What are you going to do with that razor?" to which he replied, "I am going to cut Frank Gallo's head off;" that three or four others took hold of him (the defendant), and as soon as he could he escaped and tried to run away ; that he tried to get out the back door, but could not; that he then went upstairs and on his way found his revolver lying on what he called a window, but which was claimed to be a roll of wall paper suspended from hooks or nails in the wall; that while upstairs he found a hat belonging to some one else, put it on, jumped out of the window, and went towards home, but was met by an officer and arrested before he reached there.    He also testified that he did not intend to shoot anybody, and did not know when he left the house that the decedent had been shot.    The jailer who had him in charge testified that he had cuts on his face—one on the right side of his head, another near his left eye, another above his eye, and that his coat

was cut. Angelo Gillette was also called as a witness for the defendant, and testified that he was present when the shooting took place, and his evidence as to the transaction corroborated that of the defendant. He testified that after the last drinks had been paid for by the defendant "he stood up against the counter, and James Bovenze asked him over again to go. Frank Gallo said: 'You people can go. I don't want to come.' * * * Fred Lorenze said : 'You fellows can go. If Frank wants to stay here, there is a bed for him.' * * * Frank then started to go towards James Bovenze, and when Frank reached where James Bovenze was, it seems to me that James Bovenze lightly touched him with the hand. He said, 'Why is it you act so stubborn, and you don't want to come?' He meant that he held back, and didn't want to go. * * * Joseph Bovenze then said: 'Let that damned stinker go. Don't give him so much to say. I will just about cut his face off.' * * * He pulled out his razor, and went for Frank. * * * Frank thought he was fooling, and he was dodging him. I seen he couldn't hide his head any more, and he pulled out his revolver, and shot up in the air. * * * At the first shot Fred Lorenze and his wife, and the rest of the people in there, all got into a bunch, and I couldn't see anything more before the second shot. * * * I didn't see which direction he went, or where he went." He then testified that that was all he remembered. There was proof that a razor was found on the floor in the saloon on the following morning; that Mrs. Lorenze, who attempted to prevent Joseph Bovenze from following the defendant, received a cut upon her hand, and went to the hospital to be treated for it; that at about half past 10 o'clock a policeman, when passing the saloon, heard loud talking, as if people were excited, and soon after heard the shooting which took place; that upon entering he found one of the Italians and a woman "jostling a little," and separated them ; that near the wall was Lorenze, and there was somebody in front of him, with a chair raised in the attitude of striking, and he separated them, and drove them out where the decedent lay.

The evidence in this case, especially that given by the people's witnesses, is very unsatisfactory. It is obvious that the whole truth as to what occurred upon the night of the tragedy has not

been given. That one of two close friends, who had lived together, labored together, boarded together, and on the day of the tragedy were drinking together, had had no previous quarrel, had no quarrel that night in the saloon, where the entire party was drinking peaceably, each in his turn treating the other, talking quietly without disturbance or disagreement, should, without any provocation or apparent reason, shoot the other intentionally and with a deliberate and premeditated design to cause his death, seems improbable; indeed, too improbable to merit the credit which evidence should possess to become the basis of a conviction for so grave a crime. It is difficult to read their evidence without reaching the conclusion that the tragedy was not committed in the manner and under the circumstances testified to by the people's witnesses. It is more probable that it was the result of a drunken quarrel between the persons who were congregated there. The theory of the defendant is, in some respects, less improbable, and more fully corroborated by circumstances than that of the people. That there was a disturbance in the saloon prior to the shooting is shown by the policeman who was passing. A razor was found on the floor the following morning. The defendant and his clothing were cut. Mrs. Lorenze was also wounded. The defendant had no razor. These circumstances, with others, tend to show that this transaction did not occur under the circumstances testified to by the witnesses for the people. While the people's evidence was sufficient to establish the fact that the defendent shot the decedent, yet, as to the circumstances which attended the shooting, it is too vague and uncertain to establish with reasonable certainty that the defendant was guilty of the crime of murder in the first degree. When we consider all the evidence in the case, we find it so uncertain, so apparently unreliable, and so improbable that the whole truth relating to this transaction has been given, that we feel satisfied that justice requires a new trial in this case. The trial was concluded, and the verdict rendered, January 17, 1895. At the request of the defendant his sentence was postponed until the 16th of the following month, to enable him to make a motion for a new trial. The motion was made on that day. It was based, among others, upon the grounds that the jury were guilty of misconduct during the trial, by rea-

son of which a fair and due consideration of the case was prevented; that they received evidence in the absence of the defendant; that they separated during the trial, had interviews with different persons, and frequented public places of resort and amusement without leave of the court. Affidavits were read tending to show misconduct upon the part of the jury. Counter affidavits were read in behalf of the people. The motion was denied. The defendant appealed from the order denying his motion for a new trial, as well as from the judgment. The affidavits read in support of the motion were to the effect that the jury, under the direction of the court, visited the saloon where the tragedy occurred; that neither the defendant nor his attorney accompanied them or was present; that the jury were accompanied by two sworn officers, and by a person who was not sworn as an attendant, but designated by the court to show the premises to the jury; that Fred Lorenze, a witness for the people, was in the possession of the premises, and was present when they were viewed by the jury, and that there were several other persons present; that the witness Lorenze conversed with the jury, and offered them cigars, which some of them accepted; that when examining the stairway leading to the rooms over the saloon, the jury saw a cleat nailed to the wall, with hooks upon it, from which was hanging a roll of wall paper, and one or more of the jurors asked Lorenze, through an interpreter, if it was the same then as on the night of the homicide, to which he replied that everything was in the same condition as then; that Lorenze explained to the jury the position of the several persons who were present when the tragedy occurred; that the witness Rancone pointed out to the jurors the windows from which it was claimed the defendant jumped after the homicide, and that the jurors separated during the time they viewed the premises. Some of these facts were controverted in the affidavits read by the people, but there was practically no dispute as to the facts that the witness Lorenze conversed with the jurors; that he offered them cigars, which some of them accepted; that he talked with them about his license; that when examining the stairway he was asked if everything there, including the cleat and roll of paper, was the same as on the night of the homicide, to

which he replied in the affirmative; and that the jurors became separated during the time.

The apellant contends that the effect of this proceeding was that the jury, in his absence, received evidence having a material and important bearing upon the issues before them. One of the questions in dispute on the trial related to the condition of the stairway, particularly to the condition of the hooks, and whether there was wall paper hanging from them upon which a revolver could have been laid. The defendant claiming there was a cleat with hooks, and paper was hanging from them horizontally, so that a revolver might have been placed upon the roll of paper, while the people claimed that it hung vertically, or nearly so, and that a revolver could not have been placed thereon. The defendant had testified that the revolver was taken away from him, and that, as he was going upstairs, he found it upon what he called a window, and put it in his pocket. Whether there was anything in that place upon which the revolver could have been laid was one of the contested points in the case. If the roll of paper hung horizontally, it might have been claimed, perhaps with some show of reason, that the revolver was laid upon it, and that the defendant's statement as to finding it there was correct. That the situation at that time was considered material by the trial court is apparent, as it was referred to by him in his charge. At the time the jury viewed the premises, the roll of paper was hanging with one end upon the hooks and the other pointing towards the floor, so that it would have been impossible for a revolver to be laid upon it. When they received the statement that it was in the same position on the night of the tragedy, it furnished to them evidence that the testimony of the defendant was untrue. As it was given in the absence of the defendant, and out of court, it was improperly received. It cannot be said that this was harmless, or that it did not prejudice the defendant or affect his substantial rights.

Upon a full consideration of all the facts and questions presented by the record in this case, we are led to the conclusion that justice requires that the judgment and order appealed from should be reversed, and a new trial granted. All concur.

O'BRIEN, J., concurs in result on the merits of the case and on the ground that the case was improperly submitted to the jury under the second count of the indictment and the last clause of section 183 of the Penal Code. There was no proof in the case to warrant the submission of the case on the theory described in that count of the indictment and in that clause of the section defining murder in the first degree.

Judgment and order reversed, and new trial granted.

### NOTE ON "STATEMENTS MADE TO JURORS OUT OF COURT."

Presence of jury, at various times during the trial, in the main office of an hotel, where persons were passing in and out, furnishes no ground for reversal, where they were not spoken to about the case, and it was not discussed or alluded to in their hearing. State v. Fairlamb (Mo. Sup.), 25 S. W. 895.

Fact that one of the jurors repeated aloud, within the hearing of his son, to the attending bailiff a message, which he requested the bailiff to deliver to his son, relating to some work which was to be done at the juror's home, will not vitiate the verdict. Cornwall v. State, 18 S. E. 154; 91 Ga. 277.

Fact that one of the jurors, who were on the street in charge of the sheriff, called across the street to a relative to inquire about the physical condition of his mother, and walked with the sheriff partially across the street in view of the other jurors, and, in a voice loud enough for them and the sheriff to hear, spoke of her possible death, is not ground for a new trial. State v. Howell, 23 S. W. 263; 117 Mo. 307.

Fact that, on several occasions while the trial was pending, a juror, as he was leaving the court room during a recess of the court, was engaged in conversation by certain witnesses for the state, who commended the prosecuting witness, and condemned the defendant, does not furnish sufficient ground for setting aside the verdict, where the juror did not begin or invite the conversation, but endeavored to turn it to some other topic, and it is not claimed that the prosecution was responsible for the conduct of such witnesses. State v. Allen (Iowa), 56 N. W. 261.

The fact that one of the jurors overheard "We, the jury, find the prisoner guilty," said by one of a crowd in the street along which the jury in a body, and in charge of a bailiff, were passing to dinner, is no ground for a new trial, where the person who made the remark did not intend the jury to hear it, and none of them were influenced by it. Tyier v. State, 18 S. E. 146; 91 Ga. 254.

Conduct of a number of jurors in visiting, during a recess, and without the knowledge of the court and the parties, the place of an occurrence shown by the testimony, and in there discussing the occurrence with others, one of whom was a witness who had testified, constitutes a gross violation of duty, which will vitiate the verdict. Conrad v. State, (Ind. Sup.), 43 N. E. 221.