## Court of Appeals.

February 21, 1905.

## THE PEOPLE v. FRANCESCO RAFFO.

(180 N. Y. 434.)

MURDER—EVIDENCE NECESSARY TO ESTABLISH PREMEDITATION AND DELIBERATION.

The evidence upon the trial of an indictment for homicide, reviewed and held insufficient upon which to base a finding of the premeditation and deliberation necessary to sustain a verdict convicting the defendant of the crime of murder in the first degree.

APPEAL from a judgment of the Supreme Court, rendered February 18, 1904, at a Trial Term for the county of Westchester, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

William Temple Emmet, Grenville T. Emmet and George C. Andrews for appellant.

The conviction should be reversed because Ahearn was slain while he was in the act of making an unlawful arrest, and it is not murder in the first degree to kill either an officer or a private citizen who is making an unlawful arrest. (Elk v. U. S., 177 U. S. 529; Wert v. Cabell, 153 id. 78; Comm. v. Drew, 4 Mass. 391; Comm. v. Carey, 12 Cush. 246; Comm. v. McLaughlin, 12 id. 618; Roberts v. State, 14 Mo. 138; People v. Burt, 51 Mich. 199; Briggs v. Comm., 82 Va. 554; Muscoe v. Comm., 86 id. 443; Rafferty v. People, 69 Ill. 111; 72 id. 37; Noles v. State, 26 Ala. 31; Galvin v. State, 6 Cold. [Tenn.] 283; Poteele v. State, 9 Baxt. [Tenn.] 261; State v. Oliver, 2 Houst. [Del.] 585; State v. Belk, 76 N. C. 10; Ross v. State, 10 Tex. App. 455.) The conviction should be reversed because it was legally impossible for the jury to find any premeditation or deliberation in connection with the shot that killed Ahearn. (People v. Boggiano, 179 N. Y. 267; Leighton v. People, 88 id. 117; People v. Majone, 91 id. 211; People v. Conroy, 97 id. 62; People v. Hawkins, 109 id. 408; People v. Johnson, 139 id. 358; People v. Constantino, 153 id. 24; People v. Kennedy, 159 id. 346.) It was error to allow the case to go to the jury at all as a case of murder in the first degree. (Bad Elk v. U. S. 177 U. S. 529; Comm. v. Drew, 4 Mass. 391; Comm. v. McLaughlin, 12 Cush. 619; Comm. v. Carey, 12 Cush. 246; Wharton Crim. Law [10th ed.], § 414; 1 Bishop New Crim. Law [8th ed.], § 736, subd. 4; § 868, subd. 2; 2 Bishop New Crim. Law [8th ed.], § 37, subd. 2; § 652; Roberts v. State of Missouri, 14 Mo. 138; People v. Burt, 51 Mich. 199; Wert v. Cabell, 53 U. S. 78; Briggs v. Comm., 86 Va. 554; Muscoe v. Comm., 86 id. 443; Rafferty v. People, 69 Ill. 111; 72 id. 37.)

J. Addison Young for respondent.

The verdict of the jury in this case was right and is based on clear and convincing evidence. The record shows that the defendant received a most fair and impartial trial. None of his rights were prejudiced and the judgment should be affirmed. (People v. Hoch, 150 N. Y. 291; People v. Youngs, 151 id. 210; People v. Sutherland, 154 id. 345; People v. Kennedy, 144 id. 449; People v. Tobin, 176 id. 278; People v. Ennis, 176 id. 289; People v. Rodawald, 177 id. 408.)

WERNER, J.: The defendant appeals from a judgment convicting him of the crime of murder in the first degree. Many questions are urged upon us by his faithful and zealous counsel, as presenting grounds of error for which the judgment should be reversed, but after mature reflection we think there is only one question that needs to be discussed, and that is whether the evidence warrants a conviction of murder in the first degree. That is a serious and delicate question upon which, after considering the case from every point of view, we feel constrained to differ with the learned trial court. In doing so, however, we desire to express our unqualified approval of the general conduct of the trial by the learned court and the district attorney, whose commendable fairness and impartiality are evinced upon every page of the record. The pertinent facts bearing upon the question whether the defendant, who was the conceded perpetrator of a homicide, should have been found guilty of murder in the first degree, or of some lesser degree, are as follows:

Shortly after midnight on the 20th day of June, 1903, the defendant Raffo shot and killed one Ahearn in what is known as "Rochelle Park," in the city of New Rochelle, Westchester county. There is no dispute as to the shooting and killing, both of these facts being admitted by the defendant. Upon

the trial the issue upon the merits was whether the homicide was justifiable, the defendant claiming to have acted in self-defense. There are only two living eye-witnesses to the homicide. The first is Dr. Johnson, who testified for the prosecution, and the other is the defendant, who testified in his own behalf. Before adverting to the conflicting stories told by these two witnesses, and upon which the whole case turns, it will be useful to refer to a few of the surrounding facts and circumstances.

The defendant Raffo is an Italian, who, at the time of the homicide, was twenty-six years of age, and had then been in this country six or seven years. During the greater part of that period he had lived and worked in and about New Rochelle. At the time of the homicide he was employed in a marble quarry at Tuckahoe, which is about six miles from New Rochelle, and he boarded near by. He had become engaged to an Italian girl named Valardina Sheraffo, who lived in the family of one De Pippo, residing at 99 Oak street in New Rochelle. In anticipation of the marriage, which was to take place on the Sunday following the homicide, Raffo had rented a room in a house adjoining that of De Pippo, and had purchased furniture and other necessaries for housekeeping. At the close of his day's work on Friday, June 19th, he left Tuckahoe and went to 99 Oak street in New Rochelle, where he passed the evening with his betrothed and the De Pippo family. He left there shortly after 10 o'clock in the evening, intending to return to Tuckahoe. On his way he passed the premises of Siebrecht and Archer, who lived on the outskirts of New Rochelle, adjoining each other. Siebrecht, for whom Raffo had worked at one time, had an extensive florist's establishment, and Archer was engaged in the business of raising chickens. Raffo went upon the Siebrecht premises, took therefrom about 200 cut carnations, a jardiniere, and some material known as raffia, used in tying flowers. He then pro-

ceeded to the Archer premises, entered the stable, emptied a bag containing some crushed corn, and then went into the adjoining hen house, where he killed three chickens. The chickens, jardiniere, flowers and raffia were placed in the bag, and with this thrown over his right shoulder and an empty pail in his left hand, he retraced his steps towards 99 Oak street, instead of continuing his journey to Tuckahoe. He arrived at Rochelle Park shortly after midnight, where he encountered Ahearn, his victim. Ahearn was a watchman employed by the residents of Rochelle Park to patrol their premises, and had been sworn in as a special policeman under an ordinance of the city, but was clad in citizen's dress. The differing narrations of what transpired when these two men met can best be told in the language of Dr. Johnson for the prosecution, and of the defendant in his own behalf.

Dr. Johnson, a dentist, practicing in New York city, was residing temporarily in the " Hawkins House " in Rochelle Park. This was 147 feet distant from, and directly in line with, the lamp-post where Raffo and Ahearn met. Johnson had been to the city to get some medicine for a Miss Hawkins, who was ill. Upon his return he retired, and was not yet fully asleep when he was aroused by the barking of a dog and loud talking. He did not arise at once, but as the barking and talking continued he went to a window overlooking the park, and, under the gas light in the roadway, he saw two men. One was a large man, and facing him, within two or three feet, was a small man. Johnson heard the large man say, " What have you got in that bag ? " To which the smaller man replied, " What the hella for." This was repeated several times, when the large man became angry and said, " I want to know; I am the watchman here and I must know what is in that bag. No more of your damn nonsense, show me what is in that bag or I will take you to the lockup, or I will jug you." After he had said " no more of your damn

nonsense " he sort of reached out with his left hand and struck the small man over the head with his right hand. He struck him two or three times, and then the small man dropped his bag and they clinched. They surged forward and backward under this lamp over a surface of twenty or twenty-five feet, and after the small man appeared to be getting the better of the schuffle there was a shot. Just before this shot the large man cried out, " For Christ's sake don't kill me," and immediately following the shot he yelled out " murder or help." After the exclamation " For Christ's sake don't kill me," and the shot which followed, they surged a little while, and then there were two other shots in quick succession; the whole thing did not take the fraction of a minute. During all this time they were under the lamp-post, sort of circling around, and then they backed up to the grass. When they got on the grass, which is the other side of the lamp on Joseph T. Brown's property, they both fell on the ground. The smaller man disentangled himself, stood up for a moment, and kind of backed or stepped away from the body lying on the ground. Then he turned, stepped back to the man lying on the ground and fired two more shots at him. He was talking or muttering, and I did not understand all he said, but I understood him to say that he would show him what was in the bag. That is the substance of it." On cross-examination Johnson stated that the larger man struck the smaller man two or three times with a club, and struck him very hard; so hard that it sounded like hitting water with a shingle. He further stated that until the two grappled, the larger man appeared to be the aggressor in the fight. Still further on in his cross-examination he stated that at one stage of the fight he saw the larger man trying to get his hand into his hip pocket, but he could not tell whether it was before any shots had been fired.

The defendant's version of the affray is materially different. He testified, "As I was going down the Park I saw a man

come out from back of the bushes with a revolver in one hand and a stick in the other. He told me to stop there, and came close to me with the revolver up to my face; he told me to stop there and I stopped. I had the pail in one hand and the bag over my shoulder with the other hand. He said to me, that is not the way to go through and I said I have been through before and no one has stopped me, and then I asked him what I can do, I have got so far, I am here, and he said you have got to go back and I said all right. While I was starting to go back he put his pistol in his pocket and then struck me over the head with a stick. He rapped me twice on the head and then I left my pail and bag on the ground and went for him. Then he repeated it over again and struck me with the stick. We grappled and went down. At one time I was on top. At another time he was on top. When he hit me with the club he cut my head and the blood ran all over my face and blinded me. Then he put his hands to my throat and nearly choked me. While he was doing that I gave him a punch in the face. Then we both got up together and he pushed me away so hard that I fell down. Then I noticed that I was full of blood and I picked up my pistol and I shot him five times, one after the other. During the struggle I noticed that he was feeling for his revolver. I shot this man because I thought he would kill me, and I have to kill him before he shoot me."

As bearing somewhat upon the probabilities of these conflicting stories there are a few circumstances which should be considered. Ahearn was six feet one inch in height and weighed from 200 to 225 pounds. He was strong, muscular and well developed. There were three bullet wounds upon his person. One was upon the left side of the chest above the clavicle or collar bone. The bullet had cut the juglar vein, the wound bled profusely and was alone sufficient to cause death; there was no powder marks about it. Another was on the left side of the body three inches and a half inside of the nipple in

the region of the sixth and seventh ribs, from which there was very little hemorrhage and about which there were no powder marks. Another entered the back just above and inside of the right shoulder blade. The course of the bullet was inward and downward. There was no external hemorrhage from this wound and there were powder marks on the skin. The left buckle of the suspenders worn by Ahearn was found to be dented and the body underneath was slightly bruised and blackened. In addition to these wounds there was an external contusion on Ahearn's forehead, on the median line above the nose, about two and one-half inches in length, composed of many small scratches. There was a slight hemorrhage from the right nostril, an abrasion on the left hand one inch in length and a contusion over the lower end of the second, third and fourth ribs. There were two pools of blood within twenty-five feet of the lamp-post where the affray occurred, one of which was six or eight inches in diameter and the other somewhat larger, and Dr. Emberson, one of the witnesses for the prosecution, expressed the opinion that this was Raffo's blood and not that of Ahearn, because practically all the blood shed by the latter had been absorbed by his clothing.

The defendant Raffo was five feet six inches in height and of stocky build, but his weight was not given. After the affray he went to 99 Oak street where he left the coat which he had worn and took another belonging to one of the boarders, which he wore back to Tuckahoe early the next morning. His own coat was found by some of the occupants of 99 Oak street, and the woman who washed it said it was covered with blood in front, and that she found a large clot of blood in the right sleeve. Defendant had two wounds in his head, one on the left forward side an inch and a half long, with an opening of about one-eighth of an inch in width, and the other was on the right posterior side of the head one-half inch in length and of about

the same width. He had wounds or contusions on his hands and forehead. The larger wounds on his head were such as might have been made by a club, and those on his forehead and hands were such as might have been produced by scuffling or rolling on the ground.

In the light of these narrations, fortified by facts and circumstances which lead to unmistakable inferences, there can be no doubt that the homicide was preceded by a severe struggle, in which Ahearn was the aggressor, and employed a degree of violence calculated to arouse blind passion and stubborn resistance, if not aggressive attack, on the part of the defendant. It is true that Ahearn was clothed with at least some of the powers of a police officer, and that the defendant had invited suspicion by carrying a peculiar burden at a late hour of the night, after he had committed two larcenies and probably two burglaries. The difficulty is that Ahearn's official character was not disclosed by his dress, nor by any insignia, nor by any utterance of his except the statement that he was the watchman; neither did he know that the defendant had committed any crime and, so far as the evidence discloses, he said and did nothing to indicate an intention to place the defendant under arrest, except as it may be inferred from his threat " to jug " him if he did not disclose the contents of the bag.

The defendant and his motives and acts are, therefore, to be judged and weighed, not in the light of what we now know of this unfortunate affair, but in the light of what he knew of Ahearn, of what the latter knew of him, and of what each of these two men did at the time of the tragedy. At that moment the relative positions of these men were such that a different course of action than that outlined by the evidence might have given practical importance to questions that are now purely academic. Ahearn might have arrested the defendant on suspicion, and taken the chance of justifying his act by subsequently developed facts. The defendant might

have resisted arrest and taken the risk of showing that the asportation of the property which he had stolen was not a continuance of the original larceny or burglary. But according to the record neither of these things were done. Ahearn, instead of trying to make an arrest, attempted to make a search of the defendant without that formality. This was done in a manner well calculated to arouse resistance even in a guilty person. The first suggestion of resistance by the defendant was met by violence on the part of Ahearn. The defendant did not draw his pistol until after he had been clubbed. Admitting that the violence employed by Ahearn did not justify the shooting by the defendant, the question still remains whether the unjustifiable homicide was murder in the first degree, the second degree, or one of the degrees of manslaughter. When the court had charged, as was entirely proper under the evidence, that proof of the larcenies and burglaries referred to was competent as bearing upon the motive and intent with which the defendant did the shooting, but for no other purpose, * the question whether the defendant had killed Ahearn while " engaged in the commission of, or in an attempt to commit a felony," was eliminated from the case, and the only other theory upon which the defendant could have been found guilty of murder in the first degree was that he had killed Ahearn with a deliberate and premeditated design to effect his death. There is no suggestion, either in the evidence or in the argument of the learned district attorney, that defendant had formed any motive or intent to kill, before he met Ahearn, and the elements of premeditation and deliberation must, therefore, be looked for in the almost instantaneous circumstances which accompanied the shooting. And here we encounter the real difficulty in the case. Dr. Johnson's version of the affair is convincing evidence of the fact that

---

* Compare the Wilson brother cases: People v. L. R. Wilson, 141 N. Y. 185; 9 N. Y. Crim. 93; People v. C. F. Wilson, 145 N. Y. 628, 11 N. Y. Crim. 172.

it took less time to enact the tragedy than it takes to describe it. After a gruff and curt inquiry by Ahearn and a sententious, if not polite, reply by the defendant, the former proceeded to belabor the latter with a policeman's club, with such force that it sounded " like a shingle striking the water," and inflicted wounds upon his head that must have been momentarily painful, and may have stunned or confused him. These blows were followed by a scuffle during which there was a shot, an instantaneous pause, and two more shots, punctuated by the exclamations of Ahearn. All this " did not take the fraction of a minute." It is obvious that up. to this point it is difficult, if not impossible, to seize upon a single fact or circumstance that is not as consistent with the theory of murder in the second degree or one of the degrees of manslaughter, as with the theory of murder in the first degree. If, at this juncture in the affray, the defendant had found time for premeditation and deliberation, it must have been through a mental process so subtle and rapid as to be incapable of human measurement. But there was a more appreciable space of time between the firing of the first three shots and the last two shots, and the latter were accompanied by circumstances from which the prosecution argues that the necessary elements of premeditation and deliberation may be inferred. After the first three shots had been fired, the scuffle continued until the combatants reached Mr. Brown's lawn, where they both fell to the ground. The defendant " disentangled himself, stood up for a moment and kind of backed or stepped away from the body lying on the ground, Then he turned, stepped back to the man lying on the ground, and fired two more shots at him. He was talking or muttering and I did not understand all he said, but I understood him to say that he would show him what was in that bag." This is the statement of Dr. Johnson, the only eye witness of the homicide except the defendant. In the absence of more precise evidence as to the length of the interval between the

two groups of shots, we may admit there was time for premeditation and deliberation; and that the defendant's remark at the time of the last two shots could properly be considered as bearing upon that subject. This admission, however, contributes nothing toward solving the question whether the defendant committed the crime of murder in the first degree, unless we go a step further and assume that one or both of the two last shots took effect in the person of Ahearn; that he was alive at that instant; and that one or both shots either produced or hastened his death. Here we enter the realm of purest speculation. All that is known to a reasonable certainty is, that only four of the five shots were traceable by visible mark or wound. The location and direction of the two wounds in the front of the body, and the discoloration under the dented suspender buckle, when considered in connection with Dr. Johnson's description of the affray, indicate that these wounds and marks were inflicted while the combatants stood face to face during the struggle; but this theory, and it is nothing more, is considerably weakened by the fact that the wound over the collar bone severed the jugular vein and in the ordinary course of nature would produce almost immediate death. This renders it highly improbable that the struggle was continued even for an instant after the fatal wound was inflicted. It is the baldest theory also that the wound in the back must have been inflicted either while Ahearn was in the act of falling upon Mr. Brown's lawn, or after he had fallen and while he was making a last effort to rise. And yet, if that wound was not thus inflicted, there is nothing to indicate just when or how it was done. The discussion * might be continued by suggesting still other possible combinations of detail in the rapid chronology of circumstances which make up this tragedy, but the further the subject is pursued the more ap-

---

* For discussion, in some respects similar, see People v. Barberi, 149 N. Y. 256; 12 N. Y. Crim. 210.

parent does it become that the case affords no satisfactory evidence upon which to base a finding of premeditation and deliberation. It is not strange that the learned trial court and district attorney should have reached a different conclusion, for they were compelled to decide the question upon intricate and involved facts, during the progress of the trial, and in an atmosphere probably surcharged with hostility and prejudice against the defendant. Our better opportunity for a deliberate investigation of the case in all its bearings leads us to the conclusion that the question of defendant's guilt of the crime of murder in the first degree should not have been submitted to the jury, and, as we are entirely satisfied with the conduct of the trial in other particulars, we invoke the authority vested in us by the statute (Sec. 528, Code Crim. Pro.) and reverse the judgment upon the one ground we have discussed.

The judgment of conviction should be reversed and a new trial ordered.

CULLEN, Ch. J., GRAY, O'BRIEN, BARTLETT, HAIGHT and VANN, JJ., concur.

Judgment of conviction reversed, etc.

### QUARRELS, ETC., AS AFFECTING DELIBERATION, ETC.

This Raffo case is quite unusual. The court reversed the conviction, in effect, because there was no evidence of deliberation and premeditation. Of the 150 murder cases decided by the Court of Appeals, between 1887 and June, 1906, we recall but three reversals of this character; an insanity case where the court held that that issue ought to be submitted to another jury (People v. Barber, 115 N. Y. 475); a case where the court held that the people's evidence was unsatisfactory, and did not disclose the whole truth (People v. Gallo, 149 N. Y. 106; 12 N. Y. Crim. 9), and a case where the court held that the people's evidence failed to prove that the defendant could have committed the crime (People v. Carbone, 156 N. Y. 413; 13 N. Y. Crim. 105). In all the other cases, the verdict of the jury seems to have been accepted as concluding the defendants upon the facts.

This Raffo case shows the weight which brawls and quarrels have in determining the existence of the intent, premeditation and deliberation necessary to constitute murder in the first degree. There are several cases

in this series in which the evidence showed that the homicide either was or might have been the result of a brawl or quarrel. In each instance, the conviction was reversed. (See Daly v. People, 32 Hun, 182; 2 N. Y. Crim. 159; People v. Gallo, *supra;* People v. Barone, 161 N. Y. 451; 14 N. Y. Crim. 351).