356

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* LEON PATTERSON, Appellant.

First Department, June 18, 1964.

*Marc S. Gross* for appellant.

*Malvina H. Guggenheim* of counsel (*H. Richard Uviller* with her on the brief; *Frank S. Hogan, District Attorney*), for respondent.

BREITEL, J. P. Defendant appeals after a jury trial from a conviction for manslaughter in the first degree and a prison sentence of two and a-half to five years. Defendant had been indicted for murder in the second degree, but under a proper charge the jury returned a verdict only for the lesser crime of manslaughter in the first degree. Defendant denied his guilt, but never testified in his own behalf. On appeal he argues that confessions obtained from him were illegally received in evidence and that the proof was insufficient to establish his guilt beyond a reasonable doubt.

Because it is concluded that defendant's guilt was not established beyond a reasonable doubt it is not necessary to reach the issue tendered as to the confessions, namely, that they were obtained without the advice of counsel or warning of defendant's right to counsel. Notably, the confessions were obtained prior to arraignment and before defendant had or requested counsel, decision on this issue in favor of defendant would, concededly, extend the application of the exclusionary rule beyond the prevailing precedents (*People* v. *Donovan,* 13 N Y 2d 148; *People* v. *Noble,* 9 N Y 2d 571; *People* v. *Waterman,* 9 N Y 2d 561; *People* v. *Di Biasi,* 7 N Y 2d 544). Since the

proof is insufficient the judgment of conviction should be reversed and the indictment dismissed.

Defendant was a roomer in an apartment maintained by the decedent as a rooming house. All persons involved were denizens, with appropriate backgrounds, of a deteriorated area in the city. At about midnight or a little later, in the early hours of December 18, 1961, decedent was heard having a violent quarrel with defendant. Scuffling, running, a shot, further running, threats made by defendant, another scuffle, and then a series of shots were also heard. The overhearing witness distinguished decedent's footfall from defendant's because decedent limped, and it was the limping footfall, she said, which preceded defendant's footfall. There was no eyewitness, only the hearing of these events by another, a woman roomer in the apartment, who then "cracked" her door and saw the deceased lying motionless on the floor of the long narrow hallway off which the several rooms in the apartment were situated. She closed her door in fear and did nothing further until she told the police her story some hours later. A tenant on another floor also heard voices in quarrel and shots fired.

It was defendant who reported to the police some hours later finding the body of his deceased landlord, saying that he had left the apartment about 11:30 P.M., spent some hours in a bar drinking, had been the victim of an attempted robbery as a result of which he had sustained the minor wounds on his face, had returned to the apartment to find his landlord dead in the hallway, with facial bullet wounds, and the 22-calibre rifle near the body. Later defendant made a series of statements, the last while being questioned by an Assistant District Attorney was recorded in a stenographic transcript. In this recorded statement he admitted to a quarrel over rent with his landlord, a scuffle over his ejection, the landlord taking the rifle to use, defendant struggling with his landlord over the rifle, the firing of seven shots, two of which went wild and five of which penetrated the face and head of decedent.

Earlier that evening defendant, decedent and one Charlie Blue had been drinking together in decedent's rooms in the apartment. It was at the end of the evening when decedent asked defendant for the rent and defendant had replied that he did not have it. For what relevance it may have, defendant is a homosexual, and the witness Charlie Blue, an unsavory character with a criminal record who bedded with decedent, stated he did not know if decedent had been a homosexual.

The rifle was owned by decedent. He had purchased it some time before because of robberies and had kept it in a locked closet. This was established not only out of defendant's confessions but by the testimony of the witness Charlie Blue, on whom defendant in his earlier statements to the police and through counsel on the trial had tried to place the responsibility for the killing. The rifle was a semi-automatic 22-calibre weapon which used a tubular magazine holding 15 cartridges. Once the bolt was used to move the first cartridge into the firing chamber, all that was necessary to repeat the firing and eject the shell of the preceding cartridge, was to press the trigger successively. It was therefore capable of fast firing. The wounds sustained by the decedent were made in one instance by contact of the rifle barrel with decedent's face, and the others were at very close range.

There is other evidence in the case but the only further proof which is crucial is defendant's prearraignment confession with respect to the use of the rifle. The issue is whether or not the firing was in self-defense, accepting, as one unquestionably should, that it was defendant who quarreled, scuffled with, and shot the decedent.

After saying that decedent came behind him with the rifle, the prearraignment questioning proceeded as follows:

Q What happened then? A I turned around. I look, I saw the gun. He had the gun and I turned, and that's when I grab it.

Q Grabbed the gun? A Yeah. I start wrestling with him.

Q The two of you started wrestling? A Yes.

Q You were holding the gun? A That's right.

Q What happened then? A So about three or four shots went wild in the hall.

\* \* \*

Q You say that you got your hand on the trigger and what did you do, turn the gun around so it was pointing at him? A Yes.

Q You must have had the gun in your hand then. It's impossible to do it otherwise. A He was still holding onto it.

\* \* \*

Q Where did the shot hit him, the first shot? A I don't know.

Q Was it some place in the face? A Yes.

Q All right. What happened to him after he was hit? A He fell.

\* \* \*

Q Before you went away — you went out, you fired the gun again at him? How many times you fired it at him? A Three or four times.

Q After he fell down how many times you fired at him? That's what I'm trying to get at. A The shots were fired before he fell.

Q You fired the shots before he fell? A Yes.

Q How many times did you fire at him before he fell? A I mean it must have been three or four. I don't know, about three times.

Q Didn't you just tell me the first shot that hit him in the face, he fell down after the first shot; isn't that correct? A Yes.

Q He's on the ground now. The first shot knocked him down. How many times did you fire at him after he was down? That's what I am trying to get at. A I don't think I fired at him when he was down. I don't think so.

Q Stop and think. A Because I think all the shots that were fired is right before he fell.

Q You mean you fired two or three times before he fell? A Yes.

Q Where at, his face or his neck or where? In that direction? A That's right.

Q After the first shot he let go of the gun, didn't he, after he was struck in the face? A No. He was still, you know, still had the gun.

Q After you hit him in the fact [sic] with the first shot, he was still holding onto the gun? A Yes.

Q You just tole [sic] me he fell down. Which is it? You told the detectives, didn't you, that he fell down after you shot him with the first shot, and you shot him a couple times more. Isn't that correct? A Yes.

Q Is that right? A Yes.

Q Where did you shoot him after he was down? What part of his body? A In the face.

Q And how many times did you pull that trigger? A About twice.

It is evident that the questioner in trying to pin down defendant's version of the shooting, particularly the firing of the shots before and after the fall of decedent, was concerned with the element of self-defense. It is also evident, however, that defendant was being pressed by suggestive questioning to time some of the shots after decedent fell to the floor. This was proper enough inquisitorial technique — even a mandated responsibility — but without more, with respect to an uneducated person, knowingly in serious trouble, and after many hours of successive police questioning, it is hardly sufficient to establish the essential nexus for guilt. Nor is this slender prop itself supported well enough by the woman roomer's testimony that she recognized the limping footfall of the landlord preceding the footfall of defendant down the hallway just before she heard the scuffle and sound of shots, rather than the other way around as defendant stated in confession that it was the landlord who chased him down the hall.

A comment about the woman roomer is pertinent. When the police arrived she gave her version of what she heard, and then remained alone in her room. Some hours later on that early morning when others sought to question her again she was too drunk to speak intelligibly. She was never questioned again or considered as a witness until a few weeks before the trial, well over a year later.

Such proof would barely sustain a verdict and judgment in a civil tort action, but it certainly should not suffice to support a finding of criminal guilt beyond a reasonable doubt.

A homicide is justifiable when committed "[i]n the lawful defense of the slayer * * * when there is reasonable ground to apprehend a design on the part of the person slain * * * to do some great personal injury to the slayer * * * and there is imminent danger of such design being accomplished" and "[i]n the actual resistance of an attempt to commit a felony upon the slayer, in his presence, or upon or in a dwelling or other place of abode in which he is" (Penal Law, § 1055). The court properly charged the jury to this effect, as it also instructed that the defense of justifiable homicide did not shift from the prosecution the burden of proving defendant guilty of the crime beyond a reasonable doubt. The charge was also otherwise unexpectionable in advising the jury on the lesser degree of crime of manslaughter in the first degree on which the jury actually rendered its verdict. Later, the jury asked for further instructions on the issues of justifiable homicide and the lesser degree of crime, and again they received proper instructions. Nevertheless, despite full and proper instructions the evidence in the record must be sufficient to sustain the finding of guilt.

The evidence is not sufficient. At best one is left with the broadest speculation as to the accuracy of the "footfall" testimony of the woman roomer who was an "earwitness" to the crime. As to the admissions by defendant that some of the shots were fired by him after his assailant had fallen to the ground wounded by an earlier shot, one is involved in evaluating the several inconsistent statements by defendant. Notably, the incriminating ones were extracted from him by a skilled interrogator by vigorous suggestion and moral pressure. Significantly left unanswered are questions of reasonableness for continued shooting, and whether the excessive shots, if they were excessive, were fatal in effect. As his counsel observed at the time of sentence, defendant undoubtedly prejudiced his case by his unwavering denial of the killing and his refusal to permit evidence of self-defense, which could effectively come only from his own lips. But a criminal conviction should not rest on tactical error if there is doubt as to guilt and even if the sentence imposed was a generously light one.

In analyzing the proof, and in giving appropriate value to the considered findings by the jury, which by its requests for further instructions showed conscientious regard for the key issue in the case, it is significant that the jury's evaluation does not turn on the usual issues of credibility. Rather there is involved the scope for inference to be drawn from the testimonial record accepting the testimony as true, except perhaps for the footfall testimony of the woman roomer. As to the confession there is

the problem, hardly different for this court than for the jury, what significance should be given to the substantially categorical answers to suggestive questions which contradict the answers given immediately preceding and following.

In short, defendant's guilt has been established by speculation, speculation because the inference is not supported by sufficient probability to sustain a finding that defendant was initially, or subsequently became, an aggressor rather than a self-defending victim of an attack with a deadly weapon. To be sure, one might gamble that defendant probably used excessive force and perhaps even, and this is required too before he may be found guilty, beyond the time when he was still in reasonable belief that he was in peril from decedent's attack.

This is not the stuff upon which a man's liberty should be taken from him. Moreover, a person subjected to a felonious assault in his abode is not expected to engage in a detached analysis of the probabilities, and may destroy "the person making the felonious attack" (*People* v. *Ligouri*, 284 N. Y. 309, 317 [nine shots into body of armed assailant]; *People* v. *Tomlins*, 213 N. Y. 240, 242–244; 40 C. J. S., Homicide, § 131). So, too, if excessive force is used in self-defense, it must be shown that it was the excessive portion of the force which resulted in death (*People* v. *Taylor*, 92 App. Div. 29, 32–33).

The Court of Appeals once stated the applicable rule in memorable language: "When this legal presumption of innocence is rebutted, or when guilt is shown beyond a reasonable doubt, must of course, in some cases at least, be a question of law. The statute has established a standard of proof in criminal cases and the proof must conform to that standard before there can be a lawful conviction. Whenever it is clear that it falls below the prescribed standard the accused is entitled as matter of law to an acquittal. It is quite true that in many and perhaps in most cases, where there is a conflict as to the facts, or the proof is open to opposing inferences, the question whether on the whole it is of such a character as to satisfy the statute is for the jury, but it is obvious that there must, in practice, be some cases where the court will be bound to interpose and decide the question as one of law and, we think, this is such a case. So long as the burden is upon the People of not only removing the presumption of innocence, but of establishing the guilt of the accused beyond a reasonable doubt, a mere *scintilla* or even *some proof* is not sufficient to warrant the submission of the case to the jury." (*People* v. *Ledwon*, 153 N. Y. 10, 17–18, per O'BRIEN, J.)

Of course, the review of the Court of Appeals, because of its limited jurisdiction in noncapital criminal cases, is limited to questions of law, even in evaluating the proof as to whether it suffices to satisfy the standard of guilt beyond a reasonable doubt (Cohen and Karger, Powers of N. Y. Court of Appeals [Rev. ed.], § 198). This court is not so limited (Code Crim Pro., § 543-a).

The People have failed to prove the defendant guilty beyond a reasonable doubt (cf. *People* v. *Townsel*, 16 A D 2d 178, involving also self-defense in a partly-witnessed killing preceded by quarrel and scuffling). Since it is unlikely that there is further evidence to be offered, the indictment should be dismissed (see, e.g., *People* v. *Walker*, 296 N. Y. 740; *People* v. *Weiner*, 211 N. Y. 469, 475).

Accordingly, the judgment of conviction should be reversed, on the law and the facts, the indictment dismissed, and defendant discharged from custody.

McNALLY, STEVENS, EAGER and STEUER, JJ., concur.

Judgment of conviction unanimously reversed upon the law and the facts, the indictment dismissed, and defendant discharged from custody.