■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JERRY WHATLEY, Appellant.—Judgment, Supreme Court, Bronx County (Lawrence Bernstein, J.), rendered on December 20, 1984, affirmed. Concur—Sandler, J. P., Asch, Milonas and Kassal, JJ.

Carro, J., dissents in a memorandum as follows: Viewing the evidence in the light most favorable to the prosecution and giving it the benefit of every reasonable inference, I conclude that this conviction, based as it was on circumstantial evi-

dence, must be reversed, as the evidence did not exclude to a moral certainty every other reasonable hypothesis besides defendant's guilt.

On January 17, 1983, Derrick Lucher was shot several times and killed. The events leading up to that killing are not complicated. That evening, sometime between 8:00 and 9:00 P.M., Derrick Lucher, his girlfriend Valerie McKay and her sister Carla were in Leroy Lynch's apartment watching television. Carla then left to purchase cigarettes. On her way back to the apartment she met defendant, who inquired after Lucher. Defendant, who measures six feet tall and was dressed that night in a green military jacket and a tan hat, told Carla that Lucher's cousin, Kenny Mack, needed Lucher.

Defendant accompanied Carla back to Lynch's apartment where defendant and Lucher spoke. Lucher then told his friend Lynch that his cousin had been in a fight. A few minutes later defendant, Lucher, Carla and Valerie left the apartment and got into a fairly new, white four-door K-car. Defendant entered the driver's seat. Next to him was seated a black man wearing a blue bomber jacket with an attached hood. Lucher, Carla and Valerie entered the back seat.

Defendant dropped Carla and Valerie off at their home at about 10:00 or 10:05 P.M. They testified that during the ride, the three men were engaged in "friendly" and "light" conversation. The men stayed in the car. Later, at about 10:20 P.M., Ronald Rogers, while in the vicinity of 166th Street and Washington Avenue, heard the sounds of an argument. Upon turning a corner, Rogers saw a new, white K-car parked a half a block away with its engine apparently running. Two men were near the car on the sidewalk arguing while a third man was in the driver's seat.

One of the men, appearing nervous, said, "I didn't say nothing. I didn't squeal." The other answered, "Yes, you did. Yes, you did." As the argument continued, one of the men started to back away from the other, made a "pumping" motion with an object in his hand, and five shots were heard. Rogers could not see the men's faces but could see that the shooter was about 5 feet, 7 inches tall and wore either a dark or army jacket with an attached hood.

After the shooting the gunman got into the car on the passenger side and the car "spinned off" making a right turn onto Washington Avenue. The body was identified as that of Derrick Lucher. He died of shotgun wounds to the chest and vital organs.

Two days later, the police located a white, four-door 1982 Chrysler Le Baron K-car in an Avis parking lot. From the dashboard ashtray they recovered a broken fingernail and from the passenger side of the front seat a bloodstained tissue. There was also blood on the car's upholstery. Valerie McKay and Ronald Rogers identified the car as either the same one as, or a similar one to, that seen on the night of the killing.

On January 19, at 4:20 P.M., defendant appeared at the 42nd Street Precinct station house. He told Officer Zerbo that on January 17, he and his brother-in-law John Edmonds went to get Derrick Lucher regarding a problem with Lucher's cousin. They drove to 161st Street near the courthouse to look for Lucher's cousin. Defendant then dropped Edmonds off at his home and Lucher at 183rd Street and Davidson Avenue. When he got to Kenny Mack's house, his car broke down and he had it towed to Avis.

Officer Zerbo noticed that a fingernail was missing from the middle finger of defendant's left hand. Defendant explained that he had broken the nail while playing basketball and had thrown the nail away in the basketball yard. Zerbo then took the fingernail found in the car and placed it on defendant's finger. The nail matched defendant's finger. Defendant denied there had been blood or a fingernail in his car.

John Edmonds originally had told the police that he was with defendant on the night of the shooting. However, before the Grand Jury and at the trial, under penalty of perjury, Edmonds denied that he was with defendant that night.

Defendant was arrested nine months after the incident. A first trial ended in a mistrial, when the jury could not agree on a verdict. The second trial ended in a conviction for second degree murder, from which the defendant now appeals.

As this court stated in *People v McLean* (107 AD2d 167, 168, *affd* 65 NY2d 758), "[i]n a case based on circumstantial evidence the reasoning process of the jury is, of necessity, more complex; thus, close judicial scrutiny is necessary to ensure that the jury does not make inferences which are based not on evidence presented, but rather, on unsupported implications which are equivocal, at best." Therefore, to avert the danger that the trier of fact may "leap logical gaps in the proof offered" *(People v Benzinger,* 36 NY2d 29, 32), a strict standard of proof is applied in circumstantial evidence cases. That test requires "that the facts from which the inference of defendant's guilt is drawn must be inconsistent with the defendant's innocence and must exclude to a moral certainty every

other reasonable hypothesis [citations omitted]." *(People v Marin,* 65 NY2d 741, 742.) That test cannot be met here.

Viewing the evidence in the light most favorable to the People and giving it the benefit of every reasonable inference, what can, with a sufficient degree of reasonableness, be established is that defendant invited Lucher for a ride in his car under the false pretense that Lucher's cousin needed him, was present when Lucher was shot, drove away from the scene with the shooter and exhibited a consciousness of guilt in asking his brother-in-law to give a false story, in himself giving a false account of his activities that night and in resisting arrest. However, these facts, with all their reasonable implications, are insufficient to exclude every reasonable hypothesis other than that defendant was guilty of sharing a common design with the shooter to murder Lucher.

Before addressing the sufficiency of the evidence on this issue, it is first necessary to address and dismiss the People's alternative argument that defendant himself was the shooter, leaving, therefore, no doubt as to defendant's intent in shooting Lucher. Whether or not it was improper for the prosecutor to have argued this alternative theory for the first time in summation and for the court to have instructed the jury to consider defendant's guilt as the shooter or as the accomplice, matters I need not address given my evidentiary conclusions, it is clear on this record that there is simply no evidentiary basis for establishing defendant's guilt as the shooter. The shooter was described as 5 feet, 7 inches tall, whereas defendant stands at least six feet tall. The shooter wore a jacket with an attached hood. Defendant wore a jacket and a hat, while his unknown companion wore a hooded jacket. Defendant was the one driving the car approximately 15 to 20 minutes earlier when he dropped off the McKay sisters. There was evidence that the ride from where the McKay sisters were dropped off and the place where the killing occurred took about 17 to 20 minutes, thus leaving little time for defendant to have had an opportunity to switch seats with the passenger.

Also, the fact that one of defendant's fingernails had been torn from one of his fingers does not prove that he was the shooter under the hypothesis that the use of a pump-action shotgun resulted in the torn fingernail. Absolutely no evidence was ever presented to suggest that a torn fingernail is a common or even possible result of using this type of weapon. Neither is the fact that defendant lied in denying that the fingernail was his, thus indicating a possible consciousness of guilt sufficient to prove he was the shooter, since this evidence

is but a type of equivocal circumstantial evidence which is extremely weak evidence of guilt. *(See, People v Yazum,* 13 NY2d 302, 304.)* In short, the theory that defendant was the shooter is unsupported by the People's own evidence.

Neither can defendant's guilt as an accomplice be proven on this record, since it is impossible to exclude the reasonable hypothesis that defendant did not share the shooter's intent to murder the victim. "Without adequate proof of a shared intent with the principal actor, there is no community of purpose and therefore no basis for finding defendant acted in concert with the actual 'shooter'." *(People v McLean, supra,* at p 169.)

No proof nor even a suggestion of defendant's motive to kill Lucher exists. There is no evidence that he saw or otherwise knew that his companion was armed. Defendant did not participate in the argument that the shooter was having with Lucher and never verbally encouraged the shooter. Even if it can be reasonably inferred that defendant was aware of some difference of opinion between the shooter and Lucher, to find defendant guilty of murder one would also have to conclude from that inference that defendant was also aware of the shooter's intent to kill Lucher and went to get Lucher for that purpose.

While that scenario is not impossible of belief, it certainly is not the only reasonable scenario that can be deduced from the record. It is equally plausible both that defendant employed a ruse to convince Lucher to accompany him to his car solely because his unidentified companion had something to discuss with Lucher and that defendant never knew what his companion planned to do. There is also nothing to negate the possibility that even the shooter did not formulate his intent to kill Lucher until the argument was underway. Defendant's act of driving off after the shooting could as easily have been motivated by a decision not to risk an unwarranted accusation of murder as by a true consciousness of guilt. The same can be said for his attempts to cover up his presence at the scene of the crime. The evidence fails to exclude these inferences which are as plausible as the inferences the People urge us to draw.

Comparing the facts of this case with a number of Court of Appeals decisions, wherein the evidence of accomplice liability was found to have been insufficient to support murder convictions, reveals the weakness of this case on the issue of shared intent. In *People v Ligouri* (284 NY 309), for example, the evidence conclusively established defendant's presence with

the shooter before, during and after the shooting, when they fled together. There was even one witness who testified to seeing two men pursuing and shooting a third man, as well as evidence to support the fact that defendant anticipated violence. Nevertheless, the Court of Appeals ruled that such proof "[fell] far short of establishing that [defendant] aided, abetted or otherwise participated in the homicide." *(Supra,* at p 318.)

In *People v La Belle* (18 NY2d 405), defendant was present with his brother in a car when his brother twice raped the victim, remained seated in the car when the brother, then outside the car, killed the victim, and even helped the brother remove traces of the crime. Yet, the court ruled that "[t]he People's evidence in the case at bar does not lead exclusively to the inference that this defendant had knowledge of his brother's intentions." *(Supra,* at p 412.)

In *People v Monaco* (14 NY2d 43), defendant's conviction for murder as an accomplice was reversed despite an adequate basis in the record for concluding that defendant accompanied the shooter with the explicit purpose of getting into a fight with a rival gang and with the knowledge that his companion was armed with a loaded gun. Stating that "[a]n agreement to murder must be shown to exclude other fair inferences", the court held that "the proof that Monaco, in the enterprise in which he participated with Fasano, formed such a 'design' to kill is lacking in this record." *(Supra,* at p 45.)

Likewise, here, though a fair and reasonable inference may exist that defendant joined in some enterprise to reprimand or frighten Lucher, proof beyond a reasonable doubt of a formed design to kill is lacking in this record. Accordingly, I would reverse this conviction and dismiss the indictment.